945 A.2d 132 (2007)
399 N.J. Super. 606
NCP LITIGATION TRUST, Plaintiff,
v.
KPMG, Defendant.
Superior Court of New Jersey, Law Division.
Decided June 22, 2007.
*135 Karen A. Denys, and Vincent Gentile, Princeton (Drinker, Biddle & Reath, LLP, attorneys) and Mitchell A. Karlan, New York, NY (Gibson, Dunn & Crutcher, LLP, attorneys) of the New York bar, admitted pro hac vice, for defendant.
Allyn Z. Lite, and Bruce Greenberg, Newark (Lite, DePalma, Greenberg & Rivas, LLP, attorneys) and James G. Flynn (Harwood Feffer, LLP, attorneys), of the New York bar, admitted pro hac vice, for plaintiff.
WINARD, J.S.C.
This action against defendant, KPMG LLP ("KPMG"), arises out of the demise of Physician Computer Network, Inc. ("PCN"), which once developed, marketed, and supported practice management software products for physicians. On December 7, 1999, after a series of disclosures about its accounting practices, which resulted in a spiraling cash flow deficit and default on its bank debt, PCN filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. On May 9, 2002, plaintiff, NCP Litigation Trust (the "Trust"), the successor-in-interest to, inter alia, the claims of PCN against KPMG, filed suit against KPMG alleging that KPMG's breach of contract; negligence, negligent misrepresentation, and breach of fiduciary duty injured PCN.
After a long and protracted procedural history, which the court will detail below, only two claims remain against KPMG  negligence and negligent misrepresentation. KPMG now moves to 1) dismiss the complaint on the grounds that the Trust lacks standing because it cannot show that PCN has suffered an injury, and, in the alternative, 2) dismiss the Trust's claims as to KPMG's 1995 audit on the grounds that they are time-barred. The court disagrees on both grounds and, for the reasons stated below, denies KPMG's motion to dismiss in its entirety.
Background[1]
A. Mortell, Wraback, KPMG & the Fall of PCN
From mid-1993 until mid-1998, PCN, a publicly traded New Jersey corporation, retained KPMG, an international accounting firm, as its independent accounting and auditing firm. Throughout the term of the engagement, two PCN officers, John Mortell and Thomas Wraback, served as the primary liaisons between KPMG and PCN. John Mortell served as PCN's chief financial officer from 1992 to 1995, its chief operating officer from 1995 to 1997, and its president until 1998, when PCN's board of directors removed him from his position. Thomas Wraback served as PCN's controller from 1993 to 1995, its vice-president of finance from 1995 to 1996, and its senior vice-president and chief financial officer *136 until 1998, when PCN's board of directors terminated his employment.
During the mid-to-late 1990s, Mortell and Wraback engineered a plan to fraudulently inflate PCN's earnings and decrease its pliabilities. On April 1, 1996, PCN filed its annual report for the year ending December 31, 1995, on Form 10-K with the Securities and Exchange Commission (SEC). The 1995 Form 10-K reported that PCN earned revenues of almost $42 million for the year, a 104% increase from its reported revenues of $20.5 million in 1994, and a 584% increase from its reported revenues of $6 million in 1993. The inflated revenues effectively reduced PCN's net loss to $11 million, before extraordinary items. The 1995 financial statements were accompanied by an unqualified audit opinion by KPMG stating:
We have audited the consolidated financial statements of the Physician Computer Network, Inc. and subsidiaries as of December 31, 1995 and 1994, and the related consolidated statements of operations, changes in shareholders' equity (deficiency), and cash flows for each of the years in the three-year period ended December 31, 1995. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.
We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Physician Computer Network, Inc. and subsidiaries as of December 31, 1995 and 1994, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1995, in conformity with generally accepted accounting principles. Also in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, and in all material respects, the information set forth therein.
The following day, April 2, 1996, PCN announced in a press release that it had filed a registration statement and prospectus with the SEC to offer seven million shares of PCN's common stock for sale to the public. On May 7, 1996, PCN filed an amended registration statement with the SEC, lowering the seven million share offering to 5.6 million shares. The registration statement and prospectus contained a copy of the corporation's audited financial statements for 1995 and KPMG's accompanying audit report, which was included with KPMG's express consent.
In 1997, PCN filed its annual report for 1996 with the SEC, which reported revenues of $96 million  more than double the revenues of the previous year. These revenues were fraudulently exaggerated by numerous sham transactions, including:
1) G. Barry Transaction. Near the end of fiscal year 1996, PCN entered into a $3.5 million bulk deal for software *137 licenses with G. Barry Associates ("G. Barry"). Notwithstanding G. Barry's inability to obtain financing when it entered into a reseller agreement with PCN in December 1996, Mortell asked G. Barry's president, Gerald T. Barry, to write a check to PCN in the amount of $3.5 million that was backdated to the end of December 1996. Gerald T. Barry agreed to do so, but only with the understanding that the check never be presented to the bank because there were insufficient funds to cover it. The check was never cashed. Nonetheless, Mortell and Wraback caused PCN to record a journal entry as of December 31, 1996, which increased revenue and cash by $3.5 million.
2) Equifax Liability. In January 1995, PCN entered into a marketing agreement with Equifax Healthcare EDI Services, Inc. ("Equifax") which granted Equifax the exclusive right to use electronic data that PCN was developing. In 1996, Equifax prepaid $4,791,290 to PCN. PCN promptly recorded a journal entry which (i) debited cash for $4,791,290 and (ii) credited a reserve account representing a liability to Equifax in the same amount, ostensibly representing the net present value of the monthly payments discounted at 11.5% per annum. While performing the audit for fiscal year 1996, KPMG proposed an adjustment to PCN's accounts receivable reserve of approximately $1.8 million. To accomplish this, KPMG, Mortell, and Wraback attempted to reduce PCN's liability to Equifax by authoring an agreement stating that PCN had the right to terminate its contract with Equifax in 1996, instead of 1997, as the contract stated. KPMG drafted the agreement, which Mortell and Wraback signed. However, Equifax did not. Nevertheless, Mortell, Wraback, and KPMG caused PCN to reverse the $1.8 million liability for 1996, inflating PCN's net profit by said amount.
3) Failure to Defer Revenue on Maintenance Contracts. In addition to selling its customers software products, PCN also provided maintenance services on a contract basis. The customers were required to pay the fees for the entire term of the contract up front. Generally Accepted Accounting Principles (GAAP) require that revenue be recognized over time as the services are provided, and thus PCN was required to defer the unearned portion of the maintenance service fees. Notwithstanding GAAP, certain PCN insiders caused PCN's deferred revenues to be understated, and its current revenues to be overstated by $1.5 million. Generally Accepted Auditing Standards (GAAS) required KPMG to examine a sample of PCN's open maintenance contracts and trace the unearned portion of those contracts to the deferred revenue contracts to ensure that they were recorded as liabilities rather than revenues. KPMG did the opposite, tracing balances in the deferred revenue account to a purportedly complete list, created by certain PCN insiders, of invoices for PCN's maintenance contracts. KPMG noted "ho exceptions during the test and signed off on PCN's deferred revenue for 1996.
4) Failure to Properly Accrue Bonus and Vacation. Mortell and Wraback also caused PCN to fraudulently reduce PCN's expenses, in the amount of $1.5 million, by failing to record PCN employees' vacation and bonuses *138 as liabilities. Though required by GAAS to search for such an unrecorded liability, KPMG failed to do so. As a result, PCN was able to increase its net income by $1.5 million.
Notwithstanding the above, KPMG issued another unqualified audit opinion in accordance with PCN's 1996 annual report, stating that its audits were conducted in accordance with GAAS and GAAP and, in their opinion, PCN's consolidated financial statements fairly represented PCN's financial position in all material respects. Throughout 1997, PCN continued to report increased revenues and income.
B. The Curtain on Mortell and Wraback Is Pulled Back
During the audit of PCN's financial statements for the fiscal year ending on December 31, 1997, KPMG discovered several accounting irregularities. It brought these irregularities to the attention of Mortell and Wraback, as well as PCN's outside counsel. As a result, on March 3, 1998, PCN issued a press release announcing that it would restate its previously reported financial results for each of the first three quarters of 1997 and, instead, report a loss from operations for each of those quarters. PCN also announced that it would report a loss for the fourth quarter of 1997, yielding total expected losses between $27 and $31 million for the year. In that same announcement, the corporation stated that Mortell had "taken a temporary leave of absence" pending completion of the corporation's 1997 audit. Following those disclosures, the price of PCN stock fell seventy percent, hitting a record low.
In April of 1998, PCN announced both that KPMG was withdrawing its auditor's report for 1996, and that PCN had appointed a special committee of its board to conduct an investigation into the matter. From April 1998 to June 1998, KPMG continued its audit procedures and found additional irregularities in the 1996 consolidated statements. At the end of August, PCN filed a Form 8-K with the SEC, disclosing that KPMG had withdrawn its audit opinion for the 1994 and 1995 fiscal years and had discovered that the financial statements for the 1995 and 1996 fiscal years would need to be restated.
From August 1998 onwards, PCN operated at a cash flow deficit, filed for Chapter 11 bankruptcy on December 7, 1999, and was ultimately bought out by Medical Manager Corporation.
C. Birth of the NCP Litigation Trust
On or about March 15, 2000, the United States District Court for the District of New Jersey entered an order confirming the Fourth Modified Joint Plan of Reorganization (the "Plan") under Chapter 11. Under the Plan, PCN and its subsidiaries (hereinafter, collectively referred to as "PCN") agreed to contribute all causes of action that they may have  including claims against KPMG.  to the NCP Litigation Trust, for the purpose of enforcing those claims for the Trust's beneficiaries.[2] It is to vindicate the injuries to PCN, and not injuries to PCN's shareholders or creditors, that the Trust brings the present action.
Procedural History
On May 9, 2002, the Trust initiated this action against KPMG, alleging causes of action for (i) negligence, (ii) negligent misrepresentation, (iii) breach of contract, and (iv) breach of fiduciary duty. KPMG filed a motion to dismiss on various grounds. On November 22, 2002, this court issued *139 an oral opinion granting KPMG's motion to dismiss. The court based its decision solely on the issue of standing, holding that, because the wrongdoing of PCN's corporate officers had to be imputed to PCN, PCN (and, thus, the Trust) was barred by the doctrine of in pari delicto from bringing this action. Plaintiff appealed.
On May 3, 2004, the Appellate Division reversed in part, affirmed in part, and remanded the action to this court. The Appellate Division affirmed the court's dismissal of the Trust's breach of fiduciary duty claims. However, the Appellate Division held that the imputation defense is not available to one who contributes to the misconduct sought to be imputed, and that KPMG's alleged conduct  negligence, negligent misrepresentation, and breach of contract  could be considered culpable conduct that contributed to the fraud of PCN's managers. The Appellate Division concluded that the Trust's complaint alleged sufficient facts to form the basis for an equitable fraud claim as well as claims for negligence, negligent misrepresentation, and breach of contract. KPMG sought and obtained certification from the New Jersey Supreme Court.
On June 28, 2006, the Supreme Court issued an opinion which both affirmed and modified the Appellate Division's earlier decision to reinstate the amended complaint. The Court held that because KPMG's alleged negligence contributed to the misconduct of Mortell and Wraback, KPMG was barred from raising the in pari delicto defense. In the closing paragraph, the opinion states that the Supreme Court was remanding the case to this court "for discovery[,] to allow the Trust an opportunity to present evidence to support its claims that KPMG was negligent and that such negligence proximately caused damage to the corporation." NCP Litig. Trust v. KPMG, 187 N.J. 353, 385, 901 A.2d 871 (2006). The Court did not make a ruling on any of KPMG's remaining arguments to dismiss.
Initially, this court interpreted the Supreme Court's opinion as a directive to proceed with discovery, notwithstanding the alternative grounds for dismissal which it still had before it. Accordingly, this court entered an appropriate case management order. The order provided that discovery would only be stayed in the event that KPMG filed "an appropriate application for review of this Order by a court of appellate jurisdiction."
In response, KPMG sought simultaneous review in both the Appellate Division and the Supreme Court. On October 20, 2006, the Supreme Court denied KPMG's motion for clarification. However, on that same date, the court received a letter from the Clerk of the Supreme Court, which sought to convey, on behalf of the Supreme Court, some informal guidance on the issue of KPMG's alternative grounds for dismissal. The letter stated in pertinent part:
As the only issue before the Court was the applicability of the imputation doctrine, the Court's disposition does not express, and is not intended to express, anything in respect of the merits of the remaining portions of KPMG's motion to dismiss. With the reinstatement of the complaint, you still have the alternative grounds for dismissal pending before you. KPMG should be allowed to present those issues for your consideration and disposition at the pre-discovery stage of the proceedings.
On November 1, 2006, the court ordered briefing on the remaining portions of *140 KPMG's motion to dismiss.[3] Oral arguments were held on April 5, 2007.
Discussion

Standard of Review
In ruling on this motion, the court is mindful that New Jersey uses a generous standard of review. A motion to dismiss pursuant to R. 4:6-2(e) should be granted "in only the rarest of instances." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 772, 563 A.2d 31 (1989). A court's review of a complaint is to be "undertaken with a generous and hospitable approach," Id. at 746, 563 A.2d 31, and the court should assume that the non-movant's allegations are true and give that party the benefit of all reasonable inferences. Smith v. SBC Commc's Inc., 178 N.J. 265, 282, 839 A.2d 850 (2004). If "the fundament of a cause of action may be gleaned even from an obscure statement of claim," then the complaint should survive this preliminary stage. Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 626, 660 A.2d 505 (1995) (citations omitted).
I. The Trust's Complaint Pleads a Cognizable Injury to PCN; Therefore the Trust Has Standing
Whether a party has standing to bring an action is a threshold inquiry under New Jersey law. See Triffin v. Somerset Valley Bank, 343 N.J.Super. 73, 80, 777A.2d 993 (App.Div.2001). To assert standing, a party must have a "sufficient stake and real adverseness" with regard to the "subject matter of the litigation." Id. at 81, 777 A.2d 993. A party who has suffered harm as a result of the defendant's conduct has standing. See, e.g., Stella v. Dean Witter Reynolds, Inc., 241 N.J.Super. 55, 574 A.2d 468 (App.Div. 1990).
According to the Trust's complaint, KPMG's negligence and negligent misrepresentation caused PCN to incur additional liabilities and expenses, caused it to default on its bank debt, exacerbated its cash flow problems, and ultimately caused its demise. KPMG's contention, at its heart, is that PCN's further descent into insolvency and resulting bankruptcy, even if caused by KPMG, did not harm PCN, but rather only harmed its creditors and shareholders. This argument squarely places before the court the question of whether New Jersey jurisprudence recognizes the theory of "deepening insolvency" as a theory of harm to the corporation. While the court takes great care to note that the concept of "deepening insolvency" is vexatious, the court believes that New Jersey jurisprudence recognizes the theory as a legally cognizable harm.
A. New Jersey Jurisprudence and Deepening Insolvency
A corporation is recognized as a separate and distinct entity from its shareholders. Lyon v. Barrett, 89 N.J. 294, 300, 445 A.2d 1153 (1982). As a separate and distinct entity it can suffer harm, separately and distinctly from its shareholders and creditors. New Jersey, like most common law jurisdictions, recognized the venerated concept that where there is a harm the law provides a remedy. Here, the question before the court is whether an insolvent corporation can be harmed by the deepening of its insolvency. If so, then the corporation has standing.
The theory of deepening insolvency espouses the concept that an insolvent corporation suffers harm when a defendant, either *141 fraudulently or negligently, artificially prolongs, or contributes to the artificial prolongation of, the corporation's life, thereby increasing the corporation's debt and exposure to creditors, and depleting its assets. See Jo Ann J. Brighton, Deepening Insolvency: Secured Lenders and Bankruptcy Professionals Beware: It is Not Just for Officers and Directors Anymore, 23-3 ABIJ 34 (2004). The theory appears to have its roots in the case of Schacht v. Brown, 711 F.2d 1343 (7th Cir. 1983). In Schacht, officers and directors of an insurance corporation arranged an allegedly fraudulent scheme to issue extraordinarily high-risk insurance policies without retaining sufficient funds to cover possible claims. Id. at 1345. When the corporation became insolvent, the Director of Insurance for the State of Illinois was appointed as the liquidator, and eventually sued the auditor for, among other things, failing to expose the fraud. Id. at 1346. On the issue of whether the corporation had suffered an injury distinct from its shareholders, the court rejected the defendant's argument that fraud benefited the corporation, explaining, "the fact that [the corporation's existence] may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income." Id. at 1348.
Seizing upon the idea, which was coined by academics as "deepening insolvency," that an insolvent corporation is harmed by the "diminution of its assets and income," courts began to utilize it as a theory of damages which would support an independent cause of action, for example, malpractice, fraud, breach of fiduciary duty, et cetera. See, e.g., Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp.), 353 B.R. 324, 338 (Bankr.D.D.C.2006) (holding that District of Columbia recognizes deepening insolvency as theory of damages); Hannover Corp. of Am. v. Beckner, 211 B.R. 849, 854 (Bankr.M.D.La.1997) (noting that "aggravation of insolvency or prolonging the life of an insolvent business" constitutes a legally cognizable harm). Corcoran v. Frank B. Hall & Co., 149 A.D.2d 165, 545 N.Y.S.2d 278, 283 (1989) (acknowledging that "failure to disclose the insolvency of an insurance company is an injury to that corporation for which the Superintendent [of Insurance] may institute an action"); other courts have recognized the theory as an independent cause of action. See, e.g., In re CitX Corp., 448 F.3d 672, 681 (3d Cir.2006) (holding that deepening insolvency is an independent cause of action under Pennsylvania law, and defining it as the "fraudulent expansion of corporate debt and prolongation of corporate life"). Still other courts have rejected the theory. See, e.g., Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 174 (Del.Ch.2006) (holding that Delaware law does not recognize deepening insolvency as cause of action); Offical Comm. of Unsecured Creditors of VarTec Telecom, Inc. v. Rural Tel. Fin. Co-op. (In re VarTec Telecom, Inc.), 335 B.R. 631, 644 (Bankr.D.Tex.2005) (holding that Texas law does not recognize deepening insolvency as cause of action).
In line with the mixed results the theory has received in courts, considerable debate exists as to exactly how deepening insolvency harms an insolvent corporation. See Sabin Willett, The Shallows of Deepening Insolvency, 60 Bus. Law. 549 (2005). The theory's detractors argue that the acquisition of debt is a balance sheet-neutral transaction, with the company increasing its assets and liabilities by the amount of the acquired debt.[4]Ibid. Furthermore, the detractors argue, an insolvent corporation's *142 acquisition of debt actually helps the corporation by increasing its ability to meet its short-term debt.
However, these arguments ignore the "harm to the corporation [that] comes from the artificial prolongation of the defective business model employed by the company." In re Greater Se. Cmty. Hosp. Corp., supra, 353 B.R. at 336 n. 7. The artificial prolongation of the corporation's business model leads it deeper and deeper into insolvency and delays the corporation from seeking the protections of the federal Bankruptcy Code, 11 U.S.C. § 101-1532 (2007) and reorganizing into a profitable entity or liquidating. See In re Greater Se. Cmty. Hosp. Corp., supra, 353 B.R. at 336 n. 7. Under this theory, bankruptcy serves as an "antidote" to the sick corporation.
Alternatively, and the more common example, is when deepening insolvency forces a corporation into bankruptcy by forcing it to expend its resources in the repayment of newly-acquired debt. Ibid. (citing Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349 (3rd Cir.2001)). Once it is discovered that the insolvent corporation's management has fraudulently "cooked the books," and acquired immense debt, the cloud of bankruptcy hangs over the corporation's head. This cloud "can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties," R.F. Lafferty, supra, 267 F.3d at 350 (citations omitted), and diminishes the corporation's chances of becoming profitable again. "For example, if bankruptcy is a significant possibility, the corporation's suppliers will be reluctant to commit facilities to servicing a long-term contract and customers will be reluctant to purchase durable products from a corporation that might not be around to service them." Michael S. Knoll, Taxing Prometheus: How the Corporate Interest Deduction Discourages Innovation and Risk-Taking, 38 Vill. L.Rev. 1461, 1479-80 (1993). Employees may jump ship. Furthermore, many creditors will make immediate demands for payment for fear of having to compete with other creditors for payment post-bankruptcy. These problems will exacerbate the corporation's insolvency, dissipate its assets, and push it into bankruptcy. Once forced into bankruptcy under immense debt, the corporation suffers from bankruptcy's "operational limitations which hurt a corporation's ability to run its business in a profitable manner." R.F. Lafferty, supra, 267 F.3d at 350. Under this theory, bankruptcy serves as a lethal injection for the corporation, and deepening insolvency serves as its administrator. Which theory applies, of course, is subject to the unique facts of each case.
Here, the Trust has pled that KPMG's failure to detect Mortell and Wraback's fraud caused PCN to incur additional liabilities and expenses, caused it to default on its bank debt, exacerbated its cash flow problems, and ultimately caused its demise. KPMG would have the court turn a blind eye towards these allegations by suggesting that Mortell and Wraback's fraud benefited PCN by allowing it to stave off bankruptcy (which KPMG claims was inevitable). However, our Supreme Court has already rejected such a proposition. See NCP Litig. Trust, supra, 187 N.J. at 381, 901 A.2d 871 ("inflating a corporation's revenues and enabling a corporation to continue in business `past the point of insolvency' cannot be considered a benefit to the corporation."). Even if the court were to agree that PCN's bankruptcy was inevitable, the fraudulent inducement of its survival should not be considered a per se *143 benefit to it. Ibid, (citing In re Investors Funding Corp., 523 F.Supp. 533, 541 (D.N.Y.1980) ("A corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it."). Conversely, the court does not take the position that PCN was per se harmed by its fraudulently induced survival. That is a matter for the discovery process to sort. At this stage, the only question is whether the court will even recognize such a harm, if proven. In other words, do the Trust's allegations  that KPMG's negligence and negligent misrepresentation caused PCN to incur additional expenses and slide into bankruptcy  present a claim for a legally cognizable harm? This court holds that the Trust's complaint does "present[] a colorable claim," NCP Litig. Trust, supra, 187 N.J. at 385, 901 A 2d 871, for damages under New Jersey law.
B. In re CitX
Notwithstanding already holding that deepening insolvency is a form of corporate damage under New Jersey law, the court addresses KPMG's final argument. KPMG argues that In re CitX Corp., 448 F.3d 672 (3d Cir.2006) demonstrates that the theory of "deepening insolvency" will not support an independent cause of action, such as negligence. The court rejects this argument.
In In re CitX Corp., supra, 448 F.3d at 675, a Chapter 7 trustee filed suit against, among other parties, the debtor's accounting firm, Detweiler, Hershey and Associates, P.C. ("Detweiler"), alleging that the accountants negligently failed to discover the debtor's Ponzi scheme when it compiled the company's financials.[5] The crux of the trustee's claim was that Detweiler, while compiling the corporation's financial statements for the six-month period between July 1, 1999, to December 31, 1999, failed to detect that the company was insolvent. Ibid. This failure, argued the trustee, allowed the corporate directors, armed with Detweiler-compiled financial statements, to raise another $1 million in equity, which kept them in business long enough to incur millions more in debt. Id. at 676-77. The trustee alleged "deepening insolvency" as both an independent cause of action and a theory of damages. Ibid. The court affirmed the trial court's grant of summary judgment to Detweiler on the ground that the corporation could not show that it had been harmed by the accounting firm's negligence. Id. at 678. The court held that the $1 million raised in equity, even if possible only by virtue of Detweiler's negligence, did not affect the firm's solvency. Ibid. Rather, the court held, it was the mismanagement by CitX Corp.'s directors and officers of that $1 million that led to the firm's demise. Ibid. In reaching its decision, the court held that deepening insolvency was a cause of action, and flatly rejected the idea that deepening insolvency was a theory of corporate damage that could support an independent cause of action such as negligence. Ibid. Furthermore, the court held that deepening insolvency was a cause of action to be used only to remedy fraudulent conduct. Id. at 681 (defining deepening insolvency as the "fraudulent expansion of corporate debt and prolongation of corporate life" (emphasis added)).
Initially, this court notes that In re CitX Corp. dealt with Pennsylvania law, not New Jersey law. More importantly, however, the court is unsure of the viability of the In re CitX Corp. court's holding that *144 "deepening insolvency" is not a form of corporate damage, but only an independent cause of action. Causes of action are created to remedy harms. If deepening insolvency is an independent cause of action, what harm does it seek to remedy? Is it not the expansion of corporate debt and the prolongation of corporate life? The In re CitX Corp. court's definition, of deepening insolvency as the "fraudulent expansion of corporate debt and prolongation of corporate life," In re CitX Corp., supra, 448 F.3d at 681, leads to the inescapable conclusion that, even as an independent cause of action, the theory seeks to remedy the unnecessary accumulation of corporate debt, and increase in liabilities, which is what the Trust seeks in this case.
Instead, the court agrees with the holding in Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp.), supra, 353 B.R. at 337, that deepening insolvency is a form of corporate damage, and was always meant to be such. That being said, this court recognizes that the harm could occur from negligent conduct just as much as it could from intentional conduct. Ibid. This court is unaware of any principle in New Jersey tort jurisprudence that recognizes an injury when it is caused by one tort (fraud), but not when it is caused by a different tort (negligence). Ibid.
Rather, a fair reading of In re CitX Corp. is that the Third Circuit is moving towards a view that deepening insolvency, either as a form of corporate damage or an independent cause of action, is duplicative. For example, in its discussion of why deepening insolvency should not be recognized as a form of corporate damage, the In re CitX Corp. court stated, "the deepening of a firm's insolvency is not an independent form of corporate damage. Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation." In re CitX Corp., supra, 448 F.3d at 678 (citations omitted)(emphasis added).
However, corporate damage in the form of "increased liabilities, decrease in fair asset value, and lost profits" encompasses the same concept as deepening insolvency. Whether courts term it "deepening insolvency" or describe in detail the gamut of destruction that the term is meant to embrace, the bottom line is the same. Harm is harm. Where there is a harm, the law provides a remedy.
Furthermore, KPMG's reliance on In re CitX ignores the language of our Supreme Court. The New Jersey Supreme Court has stated:
As does Schacht, supra, 711 F.2d at 1348, we find that inflating a corporation's revenues and enabling a corporation to continue in business `past the point of insolvency' cannot be considered a benefit to the corporation.
NCP Litig. Trust, supra, 187 N.J. at 381, 901 A.2d 871. Though KPMG is correct in stating that the Supreme Court did not use the term "deepening insolvency" anywhere in its opinion, magic words are not essential. It is enough that the Supreme Court has recognized, much like the court in Schacht, that the artificial prolongation of an insolvent corporation's life can harm a corporation. Where there is a harm, the law provides a remedy.
C. Public Policy Considerations
Finally, the court pauses to consider the implications of ignoring deepening insolvency as a legally cognizable harm. Auditors engaged to conduct their audits in accordance with GAAS, as KPMG was here, have a duty to exercise due care in obtaining reasonable assurances *145 that the company's financial statements are free of material misstatements.[6] If the auditor fails to exercise such care, it shall be made answerable, for such failure. The court notes that most corporate shareholders, if not all, will be barred by N.J.S.A 2A:53A-25 [7] from suing the corporation's auditor for malfeasance. While certain creditors may bring suit against the auditor, they will only do so if their claim is not satisfied by the sale or seizure of the corporation's assets, and even then only if their claim is large enough to justify the cost of suit. That leaves the corporation as the only other "real party in interest." If this court does not recognize deepening insolvency as a form of harm to the corporation itself (as opposed to the creditors or shareholders) the corporation would be barred from suit by a lack of standing. This consequence would immunize auditors from being held accountable for their negligence, a result our Supreme Court has expressly rejected. See NCP Litig. Trust, supra, 187 N.J. at 380, 901 A.2d 871 ("ultimately, our goal is establish rules of law that discourage fraud and negligence, not encourage them"). In essence, rejecting deepening insolvency as a theory of damages would ""provide a safe haven for negligent conduct." Ibid. Against this backdrop, it becomes clear that deepening insolvency serves as the practical means for holding auditor's accountable for their negligence.
II. The Trust's Claims are not Untimely
KPMG also alleges that the Trust's complaint is time-barred with respect to KPMG's audit of PCN's 1995 financial statements.[8] KPMG contends that *146 it discontinued all work on PCN's 1995 financial statements prior to April 1, 1996, and thus, the complaint, which was filed on May 9, 2002, is time-barred by the six-year statute of limitations set forth in N.J.S.A. 2A:14-1.
N.J.S.A 2A:14-1 provides that an action for accounting malpractice shall be filed six years from the date that it accrues. Traditionally, a claim "accrues" when the plaintiff suffers consequential damages or a loss from the defendant's actions. Diamond v. N.J. Bell Tel. Co., 51 N.J. 594, 596, 242 A.2d 622 (1968). To take into account the fact that some plaintiffs may not be aware that they have suffered a "loss," courts have adopted the "discovery rule." The discovery rule provides that a cause of action only accrues when the plaintiff becomes aware, or reasonably should become aware, that he has suffered harm. Id. at 597, 242 A.2d 622. Thus, the question is: when did PCN know that KPMG was negligent in performing its audit work on PCN's 1995 financial statements? KPMG would have this court believe that PCN knew as early as April of 1996, when KPMG ceased all work on PCN's 1995 financial statements.
However, KPMG's argument oversimplifies the issue. This becomes apparent when one considers that the agents charged with the knowledge of KPMG's failure to detect PCN's accounting irregularities were, primarily, Mortell and Wraback,[9] the two rogue officers whose fraudulent conduct caused those irregularities and induced PCN's bankruptcy, and whose actions KPMG is charged with contributing to. In essence, KPMG is urging the court to impute the knowledge of PCN's rogue officers to PCN as part of a statute of limitations defense, notwithstanding the fact that our Supreme Court has already held that KPMG could not assert such imputation as part of an in pari delicto challenge against PCN's innocent shareholders. The court declines such an incongruous ruling.
Due to the recency of the New Jersey Supreme Court's opinion in this case, there is no reported case in New Jersey on point. However, other jurisdictions that have been faced with the issue apply the so-called "adverse interest exception." The adverse interest exception stands for the proposition that an agent's conduct will not be imputed to the principal if the agent has totally abandoned his principal's interest. It has been adopted and applied by the vast majority of jurisdictions to deal with the imputation of a rogue corporate agent's knowledge and conduct. See, e.g., Nisselson v. Lernout, 469 F.3d 143, 156 (1st Cir.2006)(Massachusetts law recognizes the adverse interest exception to imputation); McNamara v. PFS (In re Personal & Bus. Ins. Agency), 334 F.3d 239, 243 (3d Cir.2003) (Pennsylvania law recognizes the adverse interest exception to imputation); Martin Marietta Corp. v. Gould, Inc., 70 F.3d 768, 771-772 (4th Cir.1995) (Maryland law recognizes the adverse interest exception to imputation); Clark v. Milam, 192 W.Va. 398, 402, 452 S.E.2d 714 (W.Va.1994) (West Virginia law recognizes the adverse interest exception to imputation). The burden of showing that the adverse interest exception applies falls upon the party seeking to invoke it. See Beck v. Deloitte & Touche, 144 F.3d 732, 737 (11th Cir.1998)
The Beck case is illustrative. In Beck, the trustee sued the debtor's accountant, Deloitte & Touche ("Deloitte"), for malpractice, *147 alleging that Deloitte improperly used the "pooling method" in auditing the debtor's financial reports. Id. at 734. In its defense, Deloitte argued that Florida's two-year statute of limitations had expired because the suit was not filed until 1993, and certain directors and officers of the debtor, Southwest Bank, had knowledge of Deloitte's use of the pooling method back in 1988. Ibid. The court noted that Florida law adheres to the basic precept that a corporate agent's knowledge is imputed to the corporation itself. Id. at 736. However, the court also noted that Florida law recognizes an exception to this basic precept in the form of the "adverse interest exception." Ibid. To invoke the adverse interest exception, the trustee was required to show that, 1) the agent's actions were not intended to benefit the corporation, and 2) the corporation received no benefit from the agent's actions. Ibid. Because Beck's complaint sufficiently pled that the corporation's directors and officers who had knowledge of Deloitte's use of the pooling method were acting entirely adversely to the corporation, the court reversed the district court's ruling to dismiss the complaint on statute of limitations grounds. Id. at 737.
Similarly, in the case at bar, the Trust's complaint sets forth allegations that KPMG failed to detect Mortell and Wraback's fraudulent scheme to inflate PCN's earnings and revenues, which ultimately led to PCN incurring additional debt and expenses, and sliding into bankruptcy. Whether Mortell and Wraback had completely abandoned PCN's interests and whether PCN received any short-term or long-term benefit from this scheme is a matter for discovery.[10] If PCN did benefit from such fraud, even in the short-term, then the bar of the statute of limitations may be invoked. In sum, the court holds that in order to avoid imputing the knowledge of PCN's rogue managers to PCN, the Trust must show 1) that the rogue managers had completely abandoned the interests of PCN with respect to the fraudulent transactions, and 2) that PCN received no benefit from the fraudulent transactions. This is a highly fact sensitive inquiry which the court cannot make, absent discovery. Therefore, the court denies this portion of KPMG's motion to dismiss without prejudice.
Again, the court pauses to address KPMG's position and why it defies just jurisprudence. First, KPMG's argument ignores the basic tenets of the imputation doctrine. The imputation doctrine is based on the presumption that the agent has discharged his duty to disclose to his principal all material information which the agent obtained through the course of his agency. However, when the agent is engaged in acts that are entirely adverse to his principal, then the presumption dissolves. See Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828, 829 (1985) ("presumption that knowledge held by the agent was disclosed to the principal fails because [the agent] cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose"). Presently, the court is confronted with a situation where Mortell and Wraback committed fraudulent acts to inflate PCN's earnings and revenues. If these acts are shown to be completely adverse to PCN, then the presumption that they would disclose these acts fails, as should KPMG's defense. *148
Second, KPMG's arguments completely undercut the presumptions underlying the discovery rule. The discovery rule requires that a party bring suit when it becomes aware of, or reasonably should become aware of, the fact that it has been wronged. Implicit in this rule is the ability to bring suit. A corporation cannot bring suit as long as it is gagged and bound by its fraudulent corporate managers who have hijacked it.
Finally, to hold that Mortell and Wraback's knowledge should be imputed to PCN would be to gut the policies behind the statute of limitations. The purpose of the statute of limitations is to "stimulate litigants to pursue a right of action within a reasonable time so that the opposing party may have a fair opportunity to defend," and to punish lazy, slovenly parties who sit on their rights. Ochs v. Federal Ins. Co., 90 N.J. 108, 112, 447 A.2d 163 (1982) (citations omitted). However, when a corporation is essentially gagged and bound by its fraudulent managers and prevented from bringing suit, then the statute is not punishing the lazy and slovenly, but rather is punishing the recently freed captive who seeks redress against those who contributed to her captivity. Any harm suffered by defendant from a delay in bringing the action pales in comparison to that suffered by the corporation.[11]
In closing, the court is careful to note that adopting this exception does not undercut our Supreme, Court's ruling in any way. The gravamen of the New Jersey Supreme Court's opinion is that by virtue of its own alleged negligence, KPMG is estopped from raising the imputation doctrine as a defense against innocent shareholders. See NCP Litig. Trust, supra, 187 N.J. at 372 n. 2, 901 A.2d 871 ("[t]he presence of auditor negligence arguably could be called an `exception' to the imputation doctrine . . . As a practical matter, we may consider negligence to be both an exception to the imputation doctrine and a ground for estoppel. In any event, the effect is the same."). As this court sees it, the Supreme Court's ruling did not suspend long-standing principles of agency law, but rather created a procedural wall to prohibit KPMG from asserting the in pari delicto doctrine. Thus, it is not "imputation" per se that revulsed our Supreme Court, but its context, specifically as a total and complete bar to recovery against a negligent auditor under the doctrine of in pari delicto. For example, if the Trust were suing an innocent third party, the imputation defense would still be available to such a party. However, nothing in the Supreme Court's opinion suggests that KPMG is procedurally barred from raising the statute of limitations defense. Notwithstanding the fact that the court has entertained such a defense, the court rejects KPMG's position that the knowledge of PCN's rogue managers should be imputed to PCN without further inquiry. Instead, the court holds that the adverse interest exception governs, and denies this portion of KPMG's motion without prejudice.
For the foregoing reasons, KPMG's motion to dismiss is hereby denied.
NOTES
[1] Although our Supreme Court detailed the facts in its opinion, see NCP Litigation Trust v. KPMG, 187 N.J. 353, 358-64, 901 A.2d 871 (2006), the court reproduces them, with variations, for the sake of convenience. The court notes that these facts have not been established. They are merely allegations from the complaint, and are only adopted for purposes of the present motion. See R. 4:6-2.
[2] The beneficiaries of the Trust are class 7B equity interest shareholders.
[3] In its opposition brief, the Trust, citing the "breadth" of the New Jersey Supreme Court's opinion in this case, decided to drop their claim for breach of contract. Hence, the court will treat that claim as withdrawn.
[4] This anti-deepening insolvency argument conveniently ignores the concept of interest.
[5] A distinction, though not determinative of this court's holding that In re CitX Corp. does not control, is that the accounting firm, Detweiler, Hershey and Associates, P.C., was not engaged to audit CitX Corp., but only to compile the company's financials.
[6] The court is mindful of KPMG's argument that their audit was flawed as a result of the misrepresentations of certain PCN officers, namely Mortell and Wraback. Furthermore, the court recognizes that an auditor who performs his audit perfectly still may be unable to detect material irregularities or misstatements. However, the allegations in the case at bar, which must be accepted as true for purposes of this motion, are that KPMG's audit was far from perfect, irrespective of the fraud of PCN's rogue managers, and that had the audit been conducted in accordance with GAAS, it would have uncovered the fraud and prevented harm to PCN. When placed in that context, KPMG's argument essentially dissolves into one that seeks clemency for its failures on account of the fraud of PCN's managers. This argument has already been rejected by the Appellate Division and the Supreme Court. This court need not address it here, except to reiterate that management fraud cannot be used as a shield to protect a negligent auditor. See NCP Litig. Trust, supra, 187 N.J. at 372, 901 A.2d 871.
[7] N.J.S.A. 2A:53A-25 provides, in pertinent part:

Notwithstanding the provisions of any other law, no accountant shall be liable for damages for negligence arising out of and in the course of rendering any professional accounting service unless:
(1) The claimant against the accountant was the accountant's client; or
(2) The accountant:
(a) knew at the time of the engagement by the client, or agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant;
(b) knew that the claimant intended to rely upon the professional accounting service in connection with that specified transaction; and
(c) directly expressed to the claimant, by words or conduct, the accountant's understanding of the claimant's intended reliance on the professional accounting service . . .
[8] According to the complaint, PCN's 1995 financial statements improperly reported revenues of almost $42 million, and the records pertaining to the statements were in such disarray that Arthur Anderson, which was called in to re-audit the records after KPMG's services were terminated, could not reconstitute them.
[9] KPMG correctly brought to the court's attention that, in addition to Mortell and Wraback, four other officers and directors of PCN were implicated in the fraud. The court finds the distinction immaterial under the facts of this case.
[10] The court is cognizant that discovery entails costs and expense. Nonetheless, the merits, not cost, should be the final arbiter of justice. More importantly, to allow cost to creep into the analysis would be to express an opinion on the merits, which the court declines to do.
[11] It may be, depending on the facts of the case, that the harm suffered by the defendant from such a delay outweighs the harm to the hijacked corporation. However, that is not the case here. The plethora of litigation that ensued after the accounting irregularities at PCN were uncovered should have put KPMG on reasonable notice that they may be named a defendant. If they somehow missed the writing on the wall initially, the class action suit filed against them by the State of Wisconsin Investment Board in 2001 should have provided a clue.