

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2008

# Thabault v. Chait

Precedential or Non-Precedential: Precedential

Docket No. 06-2209

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Thabault v. Chait" (2008). *2008 Decisions.* Paper 456.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/456

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-2209
_____

PAULETTE J. THABAULT*, as Receiver of
Ambassador Insurance Company


v.


DORIS JUNE CHAIT, as Representative of the Estate
of Arnold Chait; PRICEWATERHOUSECOOPERS LLP

PriceWaterhouseCoopers LLP,

Appellant


_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2:85-cv-02441)
District Judge: Honorable Harold A. Ackerman

_____

Argued September 11, 2007

Before: SCIRICA, <u>Chief Judge</u>, RENDELL and FUENTES,
<u>Circuit Judges</u>.

(Filed: September 9, 2008)

_____

\* Amended in accordance with Clerk's Order dated 6/6/06
pursuant to Fed. R. App. P. 43(c)

Richard B. Whitney, Esq. [Argued]
Tracy K. Stratford
Jones Day
901 Lakeside Avenue
North Point
Cleveland, OH 44114

Robert J. Stickles, Esq.
Buchanan Ingersoll & Rooney
550 Broad Street
Suite 810
Newark, NJ 07102

Fordham E. Huffman, Esq.
Jones Day
325 John H. McConnell Boulevard
Suite 600, P.O.Box 165017
Columbus, OH 43215

<u>Attorneys for Appellee</u>

Evan R. Chesler, Esq. [Argued]
Antony L. Ryan
Cravath, Swaine & Moore
825 Eighth Avenue
Worldwide Plaza
New York, NY 10019

Jay K. Wright, Esq.
Andrew T. Karron
Matthew A. Eisenstein
Arnold & Porter
555 12th Street, N.W.
Washington, DC 20004

<u>Attorneys for Appellant</u>

Kevin McNulty, Esq.

Gibbons
One Gateway Center
Newark, NJ 07102

<u>Amicus Curiae for the Court</u>

---

OPINION OF THE COURT

---

FUENTES, <u>Circuit Judge</u>.

For over 20 years, the Insurance Commissioner for the State of Vermont (the "Commissioner") has served as receiver of Ambassador Insurance Company ("Ambassador" or "the company") and sought to recover damages for claims paid on insurance policies following the company's downward spiral and ultimate collapse.[1] In 1985, the Commissioner brought a professional malpractice claim against Coopers & Lybrand ("Coopers"), on behalf of the company, alleging that Coopers failed to disclose the insolvency of Ambassador following their 1981 and 1982 audit and negligently issued unqualified and favorable audit opinions with knowledge that the financial statements were untrue and materially understated the company's loss reserves. At trial in the United States District Court for the District of New Jersey, the Commissioner presented a traditional malpractice claim and proved to the jury that but for Coopers's negligence, Ambassador would not have continued to write insurance policies, which resulted in its ultimate failure. At the close of a nine-week trial, the jury awarded the State of Vermont $119.9 million in damages. The judgment reached $182.9 million

---

[1] At the time this action was filed, David T. Bard was the Commissioner of Banking and Insurance for the State of Vermont. Paulette J. Thabault is the current Commissioner of Vermont's Department of Banking, Insurance, Securities & Health Care Administration and has been substituted pursuant to Fed. R. App. P. 43(c).

3

after the District Court added prejudgme+6666+nt interest. PricewaterhouseCoopers ("PwC"), the successor in interest to Coopers, appeals the jury verdict. We will affirm the jury's verdict in its entirety.

## I. Factual Background

Ambassador was an insurance company incorporated in Vermont, with its principal place of business in North Bergen, New Jersey. Arnold Chait ("Chait") founded Ambassador in 1965 and served as the company's president and chief executive officer. Ambassador was a surplus lines insurance company, which insured high-risk businesses and individuals who were unable to get insurance from other companies at standard rates. In 1971, Chait formed a holding company to raise capital for Ambassador named Ambassador Group. Chait and his wife, Doris Chait, owned approximately 65% of the Ambassador Group stock; the remainder was publicly held.

By virtue of its Vermont domicile, Ambassador was regulated by the Vermont Department of Banking and Insurance (the "Insurance Department"). According to Vermont statute, Ambassador was required to file an annual financial statement with the Insurance Department ("annual Vermont statement") each year by March 15th. The applicable statute required the annual Vermont statement to be "verified by oath of two of its executive officers," but did not require that the statement be audited. See Vt. Stat. Ann. tit. 8, § 3561 (1984). The statute also authorized periodic on-site examinations by the Insurance Department examiners. Id. § 3563.

Ambassador was also required to file an annual financial statement with the Securities and Exchange Commission ("annual SEC statement"). Unlike the annual Vermont statement, the annual SEC statement had to be audited. To audit the Ambassador Group's annual SEC statements that were filed between 1979 and 1982, Ambassador retained Coopers. Coopers did not audit the annual Vermont statements that Ambassador filed with the Insurance Department; however these statements incorporated Coopers's loss reserves calculations from the audited annual SEC

4

statements.

From January to May 1981, two Vermont state examiners conducted an on-site examination of Ambassador's annual Vermont statements for the five-year period ending December 31, 1979, and detected no significant problems. In particular, the Vermont state examiners concluded that Ambassador's loss reserves reported in 1979 were adequate. The first downturn in Ambassador's financial strength was reflected in its 1981 annual SEC statement, which showed an underwriting loss. Thereafter, in February 1982, Ambassador Group's stock price dropped by almost half. Ambassador Group's 1982 annual SEC statement recorded an overall loss and showed a drop in its "surplus."[2] In April 1983, Ambassador also failed seven of the National Association of Insurance Commissioners's early warning tests that the Insurance Department used to monitor insurers' financial condition.

Following this downturn, in March 1983, the Insurance Department retained Kramer Capital Consultants ("Kramer"), an independent financial consulting firm for insurance companies and regulators, to conduct a special examination of Ambassador, including its loss reserves. Kramer, relying on Coopers's audited annual SEC statements, concluded that there were no material deficiencies in Ambassador's reported loss reserves and that it was solvent. Nonetheless, it reported that Ambassador's "financial condition has materially deteriorated, and the [c]ompany may be deemed to be operating in a hazardous financial condition." (App. 2038.) In light of this report, the Insurance Department presented Chait with a plan requiring Ambassador to halt its growth by reducing premium volumes by 30%. Chait accepted the plan but he failed to abide by it and continued to increase Ambassador's premium volumes. In September 1983, the Insurance Department ordered Ambassador to cease payment of dividends and ordered Kramer to resume its on-site examination.

---

[2] An insurance company's surplus is a measurement of the excess of assets over liabilities. Regulators typically restrict an insurer's policy underwriting to a multiple of its unrestricted surplus.

Within two months, Kramer issued a report concluding that Ambassador was $3 million insolvent.[3] Immediately, the Insurance Department filed a complaint against Ambassador in Vermont state court, seeking to enjoin Ambassador from conducting further business and to have the Commissioner appointed as receiver. Based on its conclusion that "it is unsafe and inexpedient for Ambassador to continue business," the state court appointed the Commissioner as Ambassador's receiver. (App. 1789.) In 1984, the Commissioner concluded that Ambassador could not be successfully rehabilitated and, accordingly, obtained an order of liquidation.

In May 1985, the Commissioner filed this action in the United States District Court for the District of New Jersey. The complaint alleged, among other things, negligent mismanagement and misfeasance, breach of fiduciary duty, fraud and negligent misrepresentation against Arnold and Doris Chait and Richard Tafro, Ambassador's former vice president of finance. Relevant here, the complaint also asserted a cause of action for negligent auditing practices against Coopers.

In his claim against Coopers, the Commissioner alleged that Coopers was negligent in its audit of Ambassador's 1981 and 1982 financial statements.[4] Specifically, the Commissioner claimed that as a result of its audit of Ambassador Group and its subsidiaries, Coopers either knew or should have known in early 1982 that Ambassador was only marginally solvent and should not have continued writing new insurance policies. He further alleged that if Coopers had issued the adverse audit opinion that it should have

---

[3] "Insolvent" is defined as a debtor "having liabilities that exceed the value of assets" or the inability to pay debts as they fall due or in the usual course of business. See Black's Law Dictionary 812 (8th ed. 2004).

[4] The Commissioner presented evidence at trial regarding Coopers' 1982 audit, however, the District Court determined that the jury could only be asked whether Coopers was negligent in the 1981 audit and, if so, whether that negligence caused damages to Ambassador. This ruling is not before us.

6

the regulators could have acted to protect Ambassador and its policyholders, claimants and creditors.

In November 1997, following Chait's death, the Estate of Arnold Chait (the "Estate") was substituted as a defendant in the Commissioner's action. Coopers, a national accounting firm, subsequently merged with PriceWaterhouse to form PriceWaterhouseCoopers ("PwC") in 1998.[5] In the years that followed, PwC filed numerous motions, seeking, among other things, summary judgment and separate trials for the Commissioner's claims against PwC and the Estate. All the motions were denied. Approximately six weeks before trial, the District Court, *sua sponte,* entered default against Chait's estate, pursuant to Federal Rule of Civil Procedure 55(a), for failure to comply with a Court order to seek replacement counsel or notify the Court of its intentions with regard to the litigation. The case against the Estate and PwC then proceeded to trial.[6]

At the close of the evidence, the District Court *sua sponte* entered a default judgment against the Estate, pursuant to Federal Rule of Civil Procedure 55(b)(2), removing the Estate's liability as an issue for the jury, requiring the jury to only consider Chait's percentage of fault, and instructed the jury accordingly. After deliberating for less than two days, the jury reached a verdict against PwC and the Estate and awarded total damages of $119.9 million to the Commissioner. The jury apportioned 60% of the fault to Chait and the remaining 40% to PwC. Following the jury verdict, the District Court added $63 million in prejudgment interest to the jury's damages award, raising the total liability to $182.9 million. Because PwC was deemed jointly and severally liable under New Jersey's then-applicable law, PwC was liable for the entire $182.9 million judgment. PwC now appeals the District

---

[5] For the purposes of our discussion going forward, we will refer to Coopers and PwC collectively as PwC.

[6] Doris Chait and Richard Tafro were dismissed individually with prejudice before trial pursuant to settlement agreements with the Commissioner.

Court's final judgment.[7]

On appeal, PwC argues that the District Court erred (1) in not entering judgment for PwC as a matter of law for lack of compensable injury to Ambassador on the basis that deepening insolvency cannot be used as a measure of damages for a negligence claim; (2) in not granting judgment to PwC as a matter of law for lack of proximate causation; (3) in not entering judgment as a matter of law on PwC's *in pari delicto* defense; (4) in denying PwC's motion for a separate trial because the Estate was in default and no jury issues remained as to Chait's liability; (5) by entering an excessive damages award; (6) in awarding $63 million in pre-judgment interest; and (7) in applying New Jersey law on joint and severable liability rather than Vermont law. We address each in turn.

## II. Deepening Insolvency and Damages to Ambassador

On appeal, PwC contends that the Commissioner's case was based on a theory of damages for "deepening insolvency" and that such a theory cannot be used as a measure of damages for an independent cause of action such as malpractice. PwC also maintains that it was error for the District Court not to enter summary judgment in favor of PwC because the Commissioner failed to prove that PwC's alleged negligence resulted in any cognizable harm to Ambassador. According to PwC, only Ambassador's policyholders and creditors suffered harm, not the company.

While we do not ignore the undisputed fact that there was reference made throughout this case to "deepening insolvency" as a measure of damages for PwC's negligence, we conclude that the damages presented to the jury were based on traditional New Jersey

---

[7] The District Court had subject matter jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship. We have jurisdiction under 28 U.S.C. § 1291. PwC filed a timely notice of appeal.

tort damages.[8] Under New Jersey law, the measure of damages for a negligence action are the damages proximately caused by defendant's conduct. See Schroeder v. Perkel, 432 A.2d 834 (N.J. 1981); Gleitman v. Cosgrove, 227 A.2d 689, 692 (N.J. 1967). As to damages, the District Court instructed the jury at the close of trial that:

> The Vermont Commissioner seeks damages for the net loss Ambassador incurred from its continued operation after March 31st, 1982. The Vermont Commissioner contends that [PwC] is liable for such damages because Ambassador would have been prevented from writing new business if [PwC] had conducted an audit of [Ambassador] year-end 1981 financial statements in a non-negligent manner. Accordingly, the [Commissioner's] theory of damages is that, because of [PwC's] alleged negligent audit, Ambassador was permitted to continue to write new business until November 9, 1983. During that time, the [Commissioner] contends that the insurance that [Ambassador] wrote produced claims that cost the company more than the premiums, plus interest and other investment income on those premiums, it collected for that insurance. The [Commissioner] claims that this amount equals $119.9 million and that this constitutes the company's damages. . . . Your job as jurors will be to consider the evidence that the [Commissioner] has presented relating to Ambassador's insolvency and its consequences.

---

[8] In denying PwC's motion for summary judgment as to the Commissioner's claim and the motion to strike the "wrongful corporate life" damages theory, the District Court engaged in a choice of law analysis and concluded that New Jersey law would control the substantive issues. The parties do not dispute that New Jersey law applies to the substantive issues and only dispute the applicability of New Jersey's law imposing joint and several liability. See infra Part VIII.

(App. 1504-05.) The question of whether PwC caused Ambassador's deepening insolvency was never put before the jury. Rather, on the question of damages, the verdict sheet asked the jurors: "Has the [Commissioner] proven by a preponderance of the evidence that [PwC's] breach was a proximate cause of *any damages* that the [Ambassador] may have incurred?" (App. 240.) (emphasis added). The jury responded: "Yes." Id. The jury was then asked to determine the *total damages* incurred by Ambassador that the Commissioner proved by a preponderance of the evidence.

Despite PwC's contention, the jury was not simply presented with a comparison of Ambassador's balance sheets at the point of wrongdoing and at the point of insolvency to show the harm done to the corporation and to measure the damages. Instead, the Commissioner proved actual damages: itemized, specific, and avoidable losses that Ambassador incurred by continuing its operations beyond the date of PwC's negligent audits. The damages that were presented to the jury were Ambassador's $119.9 million net loss from continuing operations after March 31, 1982, the date that PwC completed its 1981 audit of Ambassador. The damages were comprised of $188.2 million in total costs incurred from continuing operations past March 31, 1982 less $80.9 million in net premiums earned on the insurance policies that Ambassador wrote after this date, plus $12.6 million for the net interest expense.[9] (App. 1886.) The total cost incurred from continuing operations, $188.2 million, included the net cost of claims incurred, operating and receivership expenses, and dividends paid to the parent company. (App. 1886.) The net cost of claims incurred included future unpaid claims.

Undoubtedly, these losses, which arose from the continued writing of insurance policies, had an impact on Ambassador's solvency and increased Ambassador's liabilities. This increase in Ambassador's liabilities was caused by PwC's negligence and thus was properly considered as damages proximately caused by PwC's negligence.

---

[9] The net interest expense was the difference between the cost of borrowing and the interested earned on premiums collected.

Relying on In re CitX Corp. ("CitX"), PwC asks us to hold that whenever a plaintiff makes reference to "deepening insolvency" or "an injury to the Debtor's corporate property from the fraudulent expansion of corporate debt and prolongation of its corporate life," as part of its explanation of damages in a negligence action, recovery is not permissible. (Appellant Br. at 24-29 (citing 448 F.3d 672, 677 (3d Cir. 2006)). However, CitX does not support this proposition. When a plaintiff brings an action for professional negligence and proves that the defendant's negligent conduct was the proximate cause of a corporation's increased liabilities, decreased fair market value, or lost profits, the plaintiff may recover damages in accordance with state law.

In Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., ("Lafferty"), we held that the Pennsylvania Supreme Court would recognize deepening insolvency as an independent cause of action where it causes damage to corporate property. 267 F.3d 347, 351 (3d. Cir 2001). We defined deepening insolvency as "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." Id. at 347. We further explained that "prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets" and that such harm "can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt." Id. at 350. Lafferty was decided under Pennsylvania law, unlike the instant case which is controlled by New Jersey law.

Subsequently in CitX, the trustee of a bankrupt internet company, CitX Corporation, Inc. ("CitX"), sued the company's accounting firm for malpractice and deepening insolvency. 448 F.3d at 675. The accounting firm compiled CitX's financial statements from July 1997 through December 31, 1999. Using these financial statements at shareholder meetings, CitX raised over $1,000,000 in equity, allowing it to continue its operations and accrue millions of dollars in debt. Id. at 676. The trustee alleged that the accounting firm had "dramatically deepened the insolvency of CitX, and wrongfully expanded the debt of CitX and waste of its illegally raised capital, by permitting CitX to incur additional debt

11

by virtue of the compilation statements prepared and relied upon by third parties." Id. at 677 (internal quotations omitted).

We determined that there was no harm to the plaintiff corporation because the immediate result of the defendant's audit was to increase CitX's capital and reduce its debt through an extra $1,000,000 in investments. Id. To the extent that the extra capital, which decreased CitX's insolvency, extended the corporation's life and allowed management to incur more debt, the ultimate harm was caused by mismanagement, not the auditor. Id. at 678. In this case, on the other hand, the jury found that the negligent audit proximately caused an increase in liabilities through the writing of more insurance policies. The audit in the present case had an immediate negative consequence, as contrasted with the immediate positive consequence following the audit in CitX. In other words, the damages here are losses incurred on insurance policies that would not have been written but for Coopers's negligence.

In affirming the District Court's grant of summary judgment on behalf of the accounting firm in CitX, we stated that Lafferty had "never held that [deepening insolvency] was a valid theory of damages for an independent *cause of action*." Id. at 677 (emphasis in original). We explained that the "statements in Lafferty were in the context of a deepening-insolvency cause of action," and held that "[t]hey should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice." Id. The CitX court also stated that "[t]he deepening of a firm's insolvency is not an independent form of corporate damage." Id. at 678 (citation omitted). However, we further explained that:

> Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation.

448 F.3d at 678 (quoting Sabin Willett, The Shallows of Deepening Insolvency, 60 Bus. Law. 549, 552-57 (2005)).

What is important to note at this juncture is that whether

12

deepening insolvency constitutes a valid theory of damages for a harm is a matter that is uniquely subject to state law principles. It is well settled jurisprudence that as a federal court sitting in diversity we are required to apply the law of the state. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Commonwealth of Pennsylvania v. Brown, 373 F.2d 771, 777 (3d Cir. 1967) (stating that in diversity cases, "where the applicable rule of decision is the state law, it is the duty of the federal court to ascertain and apply that law, even though it has not been expounded by the highest court of the state"). As in Lafferty, CitX examined deepening insolvency as a theory of damages under Pennsylvania law, which is not binding in this case.

In this case, we are persuaded by New Jersey law that the Commissioner's tort damages theory was appropriate for PwC's negligent conduct. PwC asserts that "there is no reason to believe that New Jersey would authorize 'deepening insolvency' damages beyond what is authorized by Lafferty and CitX." (Appellant Br. 28.) Although neither the New Jersey legislature nor the New Jersey Supreme Court has authorized a "deepening insolvency" cause of action, contrary to PwC's assertion, there has been a trend among the state's courts toward recognizing "deepening insolvency" damages. In NCP Litig. Trust v. KMPG, LLP, ("NCP I"), the New Jersey Supreme Court addressed the question of damages resulting from the inflation of a company's revenues and continuation beyond insolvency. 901 A.2d 871, 888 (N.J. 2006). In NCP I, KMPG was retained as the accountant for the Physician Computer Network, Inc ("PCN"). Id. at 873. In the mid-1990's two officers of PCN conducted fraudulent transactions to artificially inflate PCN's revenues. Id. at 874. The auditors failed to detect the misrepresentations initially. Id. After KPMG uncovered the misrepresentations years later, the company was forced to acknowledge previously unreported losses of tens of millions of dollars. The disclosures resulted in a cash flow deficit and PCN defaulting on its bank debt. In 1998, PCN filed for bankruptcy. Id. at 876. Under the bankruptcy plan, PCN assigned all its potential causes of action to the NCP Litigation Trust (the "Trust"). Id. In 2002, the Trust initiated suit against KPMG alleging causes of action for (i) negligence (ii) negligent misrepresentation, (iii) breach of contract, and (iv) breach of

13

fiduciary duty. The trial court granted KPMG's motion to dismiss the complaint. It reasoned that because the wrongdoing of PCN's corporate officers had to be imputed to the company and because under *in pari delicto*, the Trust stood in the shoes of the company, PCN, PCN and the Trust's unclean hands barred the action.[10] Id. at 877. The Appellate Division affirmed the dismissal of the Trust's breach of fiduciary duty claims and reversed on all the remaining causes of action, concluding that the *in pari delicto* defense is not available to one who contributes to the misconduct sought to be imputed. Id. at 878.

On appeal, the New Jersey Supreme Court affirmed the Appellate Division, holding that because KPMG's alleged negligence contributed to the misconduct of officers at PCN, KPMG was barred from raising the *in pari delicto* defense. Id. at 890. In doing so, the Supreme Court explained that "inflating a corporation's revenues and enabling a corporation to continue in business 'past the point of insolvency' cannot be considered a benefit to the corporation." Id. at 888. The New Jersey Supreme Court remanded the case for discovery, noting that the only issue before it was the applicability of the imputation doctrine. Id. at 890.

On remand, the trial court addressed the question of whether New Jersey jurisprudence recognized deepening insolvency as a theory of harm to the corporation and held that it was a legally cognizable harm. NCP Litigation Trust v. KMPG, LLP, 945 A.2d 132, 140 (N.J. Super. Ct. 2007) ("NCP II"). In NCP II, the court rejected our language in CitX and embraced the theory that corporate damage could be found in the form of increased liabilities, decrease in fair asset value and lost profits, noting that such damage encompasses the same concept as deepening insolvency. Id. at 142-143. Relying on the Supreme Court's

---

[10] The *in pari delicto* doctrine dictates that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing. See Black's Law Dictionary 806 (8th ed. 2004).

14

statement in <u>NCP I</u>, the trial court held that:

> Whether courts term it "deepening insolvency" or describe in detail the gamut of destruction that the term is meant to embrace, the bottom line is the same. Harm is harm. Where there is a harm, the law provides a remedy. . . . The artificial prolongation of an insolvent corporation's life can harm a corporation. Where there is a harm, the law provides a remedy.

<u>Id.</u> at 144.

In light of <u>NCP I</u> and <u>NCP II</u>, we are not as resolute that New Jersey law would not recognize deepening insolvency as a cause of action or as a theory of damages. In the end, we are satisfied that New Jersey law provides for a remedy for traditional tort damages that flow from wrongful conduct that results in increased liabilities, decrease in fair asset value and lost profits of a corporation.

PwC also asserts that the Commissioner failed to establish an injury to Ambassador separate from an injury to its creditors and thus recovery is barred by <u>CitX</u>. PwC argues that $89.1 million of the Commissioner's $119.9 million damages calculation consists of net liabilities from insurance policies that Ambassador wrote between April 1, 1982 and November 10, 1983 – the excess of the claims paid out over the premiums received and the investment income on those premiums. According to PwC, this amount represents an increase in the liabilities of the Estate and a loss to Ambassador's policyholders, not a distinct injury to Ambassador. Further, the unpaid portion on these claims is an increase in the liabilities of Ambassador and a loss to policyholders. Today we hold that an increase in liabilities is a harm to the company and the law provides a remedy when a plaintiff proves a negligence cause of action.

Under the facts of this case, we are satisfied that a jury could properly hold PwC liable for damages under traditional negligence and malpractice principles. Accepting PwC's invitation

15

to prevent a plaintiff from recovering damages in a negligence action where there has been reference to deepening insolvency, would require us to ignore well-settled New Jersey tort law doctrine, which we are not inclined to do. We hold that traditional damages, stemming from actual harm of a defendant's negligence, do not become invalid merely because they have the effect of increasing a corporation's insolvency.

### III. Proximate Cause

PwC argues that its audits of Ambassador were not a substantial factor in the Insurance Department's failure to intervene earlier and that Ambassador's damages resulted from several other but-for causes. PwC contends that the District Court should not have charged the jury on the substantial factor test and instead should have entered judgment in favor of PwC because its negligence was "sufficiently remote" or "insignificant." Finally, PwC asserts that it is entitled to a new trial because the District Court refused to instruct the jury on superseding causes, a distinct causation test requiring a separate instruction. For the reasons stated, we reject these contentions.

#### A. Substantial Factor Test

Under New Jersey law, when "multiple factors contribut[e] to the cause of the accident," a defendant in a negligence action is not liable if his conduct was "too remotely or insignificantly related" to the injury. Brown v. U.S. Stove Co., 484 A.2d 1234, 1243 (N.J. 1984). To incur liability, the defendant's negligence must be "a substantial factor in bringing about the injuries." Id. (quotations omitted). PwC argues that the District Court should have entered summary judgment in favor of PwC as a matter of law because PwC's negligence was remote and insignificant. PwC asserts that its audits of Ambassador were not a substantial factor in the Commissioner's failure to intervene earlier because the Commissioner did not rely on PwC's audit opinions but, rather, relied on numerous third parties, including its own examiners, who did not undercover Ambassador's insolvency.

The District Court determined that the questions of

16

proximate and intervening causes were to be left to the jury for its factual determination. In denying PwC's motion for summary judgment, the District Court properly recognized that the issue of proximate cause could be addressed as a matter of law "only where the outcome is clear or when highly extraordinary events or conduct takes place." (App. 138.) The District Court found that PwC failed to provide evidence that intervening events were "sufficiently extraordinary or so clearly unrelated to the antecedent negligence that imposition of liability would be unreasonable." (App. 144 (citation omitted).) The District Court also found that PwC disputed the facts regarding proximate cause, and thus, summary judgment was inappropriate.

PwC relies on FDIC v. Ernst & Young, 967 F.2d 166, 169 (5th Cir. 1992), in which the Federal Deposit Insurance Company ("FDIC"), as receiver for the failed Western Savings Association ("Western"), filed negligence and breach of contract claims against Western's auditors, Ernst & Young. In the district court the FDIC argued that "if the audits had been accurate, . . . government regulators would have prevented further losses." Id. The district court granted summary judgment in favor of the auditors observing that the FDIC, as assignee, stood in the shoes of Western and because Western already had knowledge of its precarious financial condition neither it nor the FDIC could have relied on the allegedly negligent audits. The Fifth Circuit affirmed, noting that "[i]f nobody relied on the audit, then the audit could not have been a substantial factor in bringing about the injury." Id. at 170 (quotation omitted). The Fifth Circuit found that the sole owner of Western, Jarrett E. Woods, did not rely on the audits because it was his risky lending practices that created Western's precarious financial condition. The court held that Woods's fraudulent activities were on behalf of Western and thus his knowledge and conduct was imputable to Western. The Fifth Circuit concluded that the FDIC could not maintain a suit "for a negligently performed audit upon which neither the owner nor the corporation relied." Id. at 172.

We believe FDIC to be inapposite. The Fifth Circuit, found that the FDIC had not relied on the audits on the basis that the sole owner's knowledge and fraudulent conduct were imputable to

17

Western.  Unlike in FDIC, we will not impute Chait's conduct or knowledge to Ambassador, as discussed later.  See infra Part IV.B. Thus, Ambassador did not have knowledge of Chait's negligent conduct nor of Chait's breach of fiduciary duty as the CEO, and did not know that PwC negligently audited it.  Furthermore, the record in the instant case establishes that Ambassador relied on PwC's financial statements.  Ambassador incorporated PwC's loss reserves calculations from the audited annual SEC statements into the annual Vermont statements Ambassador filed with the Insurance Department.  The Commissioner's independent examiners relied on these same loss reserve calculations.  Finally, Ambassador relied on the PwC's loss reserves calculations from the audited annual SEC statements to continue writing insurance policies.

PwC also relies on Muhl v. Ambassador Group, Inc., No. 28414/85 (N.Y. Sup. Ct. Sept. 3, 1996), aff'd mem. sub. nom. Muhl v. Coopers & Lybrand, 660 N.Y.S.2d 969 (App. Div. 1997), a case that involves Ambassador's subsidiary, Horizon.  In Muhl, the New York Superintendent of Insurance brought an action on behalf of Horizon Insurance Company against PwC, alleging negligence based on the same audits as the ones at issue in the instant case.  The New York Superintendent, similar to the Commissioner, alleged that he would have intervened earlier had he known Horizon's true financial condition.  The New York Supreme Court granted summary judgment to PwC on the basis that the New York Insurance regulator did not rely PwC's audit of Ambassador.  The Court also emphasized that the New York insurance regulators usually relied on their "own independent examinations."  Id. at 16.  In contrast here, the annual Vermont statements that  Ambassador filed with the Insurance Department incorporated PwC's loss reserves calculations from the audited annual SEC statements.  Thus the Commissioner did rely on those loss reserve calculations, unlike the New York Superintendent, who disregarded the reports of outside auditors.

Accordingly, we believe that the District Court correctly concluded that the record contained factual disputes as to proximate cause and whether any intervening events cut off PwC's liability.  These questions were properly submitted for the jury's

18

determination. Viewing the evidence in the light most favorable to the Commissioner, the Court did not err in denying PwC's motions for judgment as a matter of law.

## B. Jury Instruction on Superseding Cause

Having determined that the District Court properly submitted the issue of proximate cause to the jury, we turn to PwC's contention that it is entitled to a new trial because the District Court refused to instruct the jury on superseding causes, a distinct causation test under New Jersey law requiring a separate instruction. A superseding cause is an event or conduct sufficiently unrelated to or unanticipated by a defendant that warrants termination of liability, irrespective of whether the defendant's negligence was or was not a substantial factor in bringing about the harm. PwC asserts that a jury could have found that Chait's independent and intentional misconduct, as well as failures by third parties such as the Commissioner's independent examiners, were superseding causes of Ambassador's injury. The Commissioner responds that PwC failed to request a proper instruction of "superseding cause" before the District Court, and thus failed to preserve the issue for appeal.

### 1. Waiver

We first address the Commissioner's assertion that PwC has waived this argument. Under Federal Rule of Civil Procedure 51(c)(1), "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." We believe this issue was not waived.

As shown in the record, PwC requested the following instruction: "If you find that plaintiff's damages were the result of an intervening cause for which [PwC] is not responsible, then you would find that the conduct of [PwC] was not a proximate cause of the plaintiff's damages." (App. 419.) The District Court denied this request and adopted New Jersey Model Civil Charge 7.13 entitled "Proximate Cause," which provides that where there is a claim of an intervening or superseding cause, Civil Charge 7.14

19

should also be charged.[11] Nevertheless, the District Court did not issue Civil Charge 7.14.[12] Furthermore, the record reflects that PwC preserved this issue for appeal by objecting to the "absence of an instruction on multiple causes and intervening cause." (App. 453.) Because Civil Charge 7.14 is very similar to PwC's requested instruction and PwC objected to the absence of such an instruction, we conclude that PwC's claim based on the absence of a superseding cause instruction was not waived. Thus, we turn to the merits of the District Court's decision not to instruct the jury on superseding causes.

### 2. The District Court's Ruling Not to Instruct on Superseding Causes

Under New Jersey law, "the doctrine of superseding cause focuses on whether events or conduct that intervene subsequent to the defendant's negligence are sufficiently unrelated to or unanticipated by that negligence to warrant termination of the defendant's responsibility." Lynch v. Scheininger, 744 A.2d 113, 125 (N.J. 2000); see also Restatement (Second) of Torts § 440 comment b (1965) ("A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm."). An intervening cause which is foreseeable or a

---

[11] The New Jersey Model Civil Charges were revised in October 2007 and these sections are now numbered 6.13 and 6.14 respectively.

[12] Model Civil Charge 7.14 states, in part: "You must determine whether the alleged intervening cause was an intervening cause that destroyed the substantial causal connection between the defendant's negligent actions (or omissions) and the accident/incident/event or injury/loss/harm. If it did, then [PwC's] negligence was not a proximate cause of the accident/incident/event or injury/loss/harm."

normal incident of the risk created by a tortfeasor's action does not relieve the tortfeasor of liability. See Lynch, 744 A.2d at 124 (quoting Rappaport v. Nichols, 156 A.2d 1 (N.J. 1959)). Ordinarily, the question of whether an intervening event supersedes a defendant's liability is left to the jury for its factual determination. Id. However, where the evidence does not suggest any superseding or intervening cause, it is improper for the trial court to instruct the jury and permit the jury to speculate that one existed. See O'Brien v. Bethlehem Steel Corp., 279 A.2d 827, 831 (N.J. 1971).

As noted above, the District Court found that PwC failed to provide evidence that intervening events were "sufficiently extraordinary or so clearly unrelated to the antecedent negligence that imposition of liability would be unreasonable." (App. 144 (quotation omitted).) We agree. However egregious Chait's conduct may have been, we cannot conclude on the record before us that the evidence presented at trial indicates that his conduct was so unrelated to PwC's negligent conduct that it would have extinguished PwC's liability. In our review of the record, we are satisfied that the District Court properly omitted such an instruction.

## IV. *In Pari Delicto*

Next we turn to PwC's argument that Chait's improper conduct should have been imputed to Ambassador, triggering the *in pari delicto* doctrine and relieving PwC of liability. "The doctrine of *in pari delicto* provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." Lafferty, 267 F.3d at 354. PwC argues that under this doctrine a corporate officer's misconduct is imputed to the corporation and a plaintiff suing on behalf of the corporation is barred from filing a third party claim in which the plaintiff is at fault. PwC argues that because the District Court found that Chait committed gross negligence and breached his fiduciary duty, and because that conduct should be imputed to Ambassador, the Commissioner suing on behalf of Ambassador, should be barred from suing PwC for wrongful conduct for which Ambassador bears fault. See Lafferty, 267 F.3d at 354.

21

## A. Waiver

The Commissioner first argues that PwC waived its right to complain about the lack of a jury instruction on the *in pari delicto* defense by not proposing an appropriate charge. The record demonstrates that PwC did propose a charge, which the District Court refused to give, which included the following language: "In general, any agents or employees of an organization may bind the organization by their acts and declarations made while acting within the scope of their authority delegated to them by the organization or within the scope of their duties as agents or employees of the organization." (App. 414). PwC also requested a question on the verdict sheet to determine if officers were acting for their own benefit, which the District Court also rejected. Finally, PwC objected to the absence of an "instruction on attribution of acts of agents or employees of an organization to the organization."[13] (App. 452.) Based on the record, it is clear that PwC preserved this issue for appeal.

## B. District Court's Ruling Not to Instruct on In Pari Delicto

PwC contends that if Chait's conduct is imputed to Ambassador, the Commissioner, as Ambassador's receiver, cannot recover from PwC. PwC asserts that Chait's conduct should be imputed to Ambassador and the *in pari delicto* defense should govern because Chait was found liable for of gross negligence and breach of fiduciary duty. PwC also argues that under the "sole actor" doctrine, which provides that acts of a controlling shareholder or dominating officer are automatically imputed, Chait's misconduct should have been imputed to Ambassador. <u>See</u>

---

[13] We also note that the District Court recognized that this was an issue of imputation and  decided it as such. (App. 468-69) ("The Court has properly ruled that imputation does not apply to this case as a matter of law."). Moreover, the District Court noted in its opinion denying PwC's post-judgment motion for judgment as a matter of law that "PwC has preserved [the imputation] argument . . . ." (App. 290.)

Lafferty, 267 F.3d at 358 ("Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation." (citations omitted))

We analyze the second requirement of the imputation test – that the officer's fraud is committed for the benefit of the corporation – under the "adverse interest exception." Id. at 359. Under the "adverse interest exception," fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and not for the benefit of the corporation. Id. This exception is subject to the sole actor doctrine which provides that if an agent is the sole representative of a principal, then that agent's fraudulent conduct will be imputed to the principal regardless of whether the agent's conduct was adverse to the principal's interests. Id.

New Jersey courts have also held that "one who contributed to the misconduct cannot invoke imputation." NCP Litig. Trust, 901 A.2d at 882. In NCP, a litigation trust acting as a bankrupt corporation's successor in interest and shareholders' representative brought an action against KPMG to recover for negligent failure to uncover fraud by corporate officers. Id. at 873. KMPG sought to invoke the *in pari delicto* doctrine. The New Jersey Supreme Court held that the *in pari delicto* doctrine does not bar corporate shareholders from recovering in suit against the auditor. Id. at 883. The court recognized an "auditor negligence" exception, explaining "that a claim for negligence may be brought on behalf of a corporation against the corporation's allegedly negligent third-party auditors for damages proximately caused by that negligence." Id. The court explained that the imputation defense is properly applied in situations where a principal's agent defrauded a third party who the principal subsequently seeks to sue. Id. The NCP court distinguished its facts by explaining that the bankrupt corporation's officers did not directly defraud an innocent third party – they defrauded the corporation and its creditors. Id. Thus, KMPG was not a victim of the fraud and allowing it to avoid liability would not serve the purpose of the imputation doctrine – to protect the innocent. Id.

PwC asserts that the Commissioner, as Ambassador's

receiver, stands in Ambassador's shoes and thus is barred from bringing claims against PwC because Chait's acts as Ambassador's president are imputed to Ambassador. To support this proposition, PwC points to the District Court's finding that Chait was "guilty of gross negligence and breach of fiduciary duty." (App. 1493-94.) PwC asserts that the "adverse interest" exception does not apply because Chait was not stealing from the company; moreover should it apply, Chait's conduct would still be imputable under the sole actor doctrine. PwC argues that the auditor exception recognized in NCP does not alter its position that Chait's misconduct is imputed to Ambassador as a matter of law because it does not bar imputation of conduct by a controlling shareholder.

First, we agree with the parties that under the first prong of the imputation test, Chait's conduct was committed in the course of his employment with Ambassador. Turning to the second requirement of the test, for the benefit of the corporation, we look at the "adverse interest exception." As stated above, under the "adverse interest exception," Chait's fraudulent conduct will not be imputed to Ambassador if his interests were adverse to the corporation and not for the benefit of the corporation. PwC asserts in its opening brief that the adverse interest exception does not apply because Chait was not "stealing from the company." (Appellant Br. at 48.) In the alternate, PwC argues that Chait's actions should be imputed to Ambassador under the sole actor doctrine. We do not agree with either assertion and decline to impute Chait's actions.

In Schacht v. Brown, the Seventh Circuit addressed the issue of who can bring claims of negligence against auditors. 711 F.2d 1343 (7th Cir. 1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 509 (1983). In Schacht, the officers and directors of an insurance corporation allegedly arranged a fraudulent scheme to issue "extraordinarily high-risk insurance" policies without retaining sufficient funds to cover possible claims. Id. at 1345. When the corporation became insolvent, a liquidator was appointed to manage its affairs and to initiate any actions belonging to the bankruptcy estate. Id. at 1346. The liquidator eventually sued the auditor for negligently failing to discover the fraud. Id. The auditor argued that the liquidator, as the corporation's

24

successor-in-interest, "stand[s] in the shoes" of the corporation and only can advance those claims that the corporation could advance directly. Id. Therefore, the corporate agents' fraud was imputable to the liquidator in the same way that it was imputable to the corporation. Id. The Court held that the corporation's officer's conduct was not a benefit to the corporation, and therefore the adverse interest exception to imputation applied. Id. at 1348. Relying on Schacht, the New Jersey Supreme Court has also held, in NCP, that inflating a corporation's revenues and enabling a corporation to exist beyond insolvency could not be considered a benefit to the corporation. 901 A.2d at 888.

Given that Chait's conduct allowed Ambassador to continue past the point of insolvency, his actions cannot be deemed to have benefitted the corporation. As in Schacht and NCP, Chait's fraudulent conduct cannot be imputed to Ambassador under the adverse interest exception. PwC attempts to distinguish NCP on the basis that Chait, unlike the defendants in NCP, was a controlling shareholder and the NCP court could not implicate the "sole actor" doctrine. However, we are unpersuaded. The NCP court did not reveal how much stock the wrongdoers owned and the court did not rely on their status as controlling shareholders. Furthermore, the "sole actor" exception is applied to cases in which the agent who committed the fraud was the sole shareholder of the corporation or dominated the corporation. Here, Chait and his wife, collectively, owned 65% of Group's stock. Thus, PwC's argument must fail.

We also deem applicable the "auditor negligence" exception recognized by the New Jersey Supreme Court in NCP, which explained "that a claim for negligence may be brought on behalf of a corporation against the corporation's allegedly negligent third-party auditors for damages proximately caused by that negligence." Similar to the fact pattern in NCP, PwC was not a victim of Chait's fraud and allowing it to avoid liability by invoking the *in pari delicto* doctrine would not serve the purpose of the doctrine – to protect the innocent.

PwC further argues that the District Court erred in denying its motions for summary judgment because the facts material to

imputation were not in dispute and if there were any disputed facts, the District Court erred in refusing to submit the *in pari delicto* defense. The District Court did not provide any reasoning or analysis on the issue of the *in pari delicto* defense, but merely rejected PwC's argument by stating that PwC's instruction was not necessary. (App. 1534.) It is clear from witness testimony that there were disputed facts as to Chait's misconduct. Based on our reading of <u>Schacht</u> and <u>NCP</u>, which control, and for the reasons stated above, we conclude that PwC was barred from raising the imputation defense against Ambassador because of its negligence and contribution to Chait's misconduct. Thus, we will affirm the District Court's denial of PwC's motions for summary judgment based on the *in pari delicto* doctrine and refusal to charge the jury on imputation.

## V. Motion to Bifurcate the Trial

PwC challenges the District Court's denial of its motion to bifurcate the trial and to try the Commissioner's claims against PwC and Chait separately. Federal Rule of Civil Procedure Rule 42(b) governs a request by a party to bifurcate a trial and provides: "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues [or] claims . . . ." Fed. R. Civ. P. 42(b). We review the denial of a motion to bifurcate a trial pursuant to Federal Rule of Civil Procedure 42(b) for abuse of discretion. <u>Barr Laboratories, Inc. v. Abbott Laboratories</u>, 978 F.2d 98, 105 (3d Cir. 1992); <u>see</u> <u>also</u> <u>Idzojtic v. Pennsylvania R.R. Co.</u>, 456 F.2d 1228, 1230 (3d Cir. 1972) ("The district court is given broad discretion in reaching its decision whether to separate the issues of liability and damages").

PwC argues that because the District Court entered a default against Chait's estate six weeks before trial for failure to respond to a court order, it was improper that he remained a defendant at the trial on PwC's liability. According to PwC, the District Court's failure try the claims against the Commissioner separately resulted in an unfair trial, forcing PwC to defend Chait because of the

26

doctrine of joint and several liability.[14] PwC contends that its liability, as the non-defaulting defendant, should have been determined in a separate trial. PwC also asserts that the District Court's charge regarding the default judgment against Chait's estate made it impossible for the jury to find PwC not liable.

In denying PwC's motions for separate trials the District Court ruled that: (1) the entry of a default rather than a default judgment, which the Court did not enter until the close of evidence, left certain issues to the jury for a final judgment; (2) the proper apportionment of fault against all parties was an appropriate consideration for the jury; and (3) evidence relating to the audit environment and Chait's conduct was relevant and properly before the jury. In denying PwC's post-judgment motion for a new trial based, in part, on the denial of its bifurcation request, the District Court found that "[m]uch of the evidence [regarding Chait's culpability] was admissible to establish the particulars of PwC's alleged negligence." (App. 291-92.)

PwC's arguments that it was prejudiced by Chait's presence at the trial and was forced to defend his actions are unpersuasive. Eliminating Chait as a defendant would have eliminated little of the evidence presented at trial. As PwC's counsel conceded at oral argument, the jury would have heard evidence of Chait's wrongdoing even in a bifurcated trial. PwC chose to defend Chait not only because of joint and several liability, but also to defend

---

[14] PwC asserts that the District Court's failure to order a separate trial as to PwC forced PwC to "[d]efend the absent Chait due to the claim of joint and several liability" and caused PwC to suffer "guilt by association" with Chait. (Appellant Br. at 55.) PwC further asserts that the Commissioner's liability theories against Chait and PwC were inextricably linked. That is, the Commissioner contended that Coopers was negligent in failing to discover and report Chait's mismanagement of Ambassador. Thus, according to PwC, with Chait included as a defendant, the Commissioner was able to focus on the allegations of mismanagement by Chait and PwC suffered the "spillover" harm from "guilt by association." (Appellant Br. at 59 (quotations omitted).)

PwC's conclusion that at the time of the audit Ambassador was properly managed. Moreover, PwC sought to reverse course and distance itself from Chiat only after the District Court found him liable.

Further, contrary to PwC's argument that the liability of Chait, a defaulted defendant, was given to the jury to determine, the District Court issued a limiting instruction, informing the jury that Chait's estate was liable to the Commissioner as a matter of law and guilty of gross negligence and breach of fiduciary duty. The District Court emphasized the jury's sole responsibility with respect to Chait was to assess his proportionate fault. Specifically, the District Court instructed the jury that:

> Although Mr. Chait's Estate is a Defendant in this case, I have entered a default judgment against the estate. Default judgment is a technical term that simply means that I have determined that Mr. Chait's estate is liable to the Vermont Commissioner on the claims made against Mr. Chait in this case. Therefore, you are to accept for purposes of your deliberations that Mr. Chait is guilty of gross negligence and breach of fiduciary duty in his role as director and officer of Ambassador. Your responsibility as triers of fact will be to assess damages against Mr. Chait's estate in accordance with the evidence you have heard and, as I will instruct later, to apportion fault as between Mr. Chait and others for what happened to Ambassador.

> I must stress, however—and I cannot stress this enough—that you are not to assume the liability of [PwC]. I repeat that simply because I have found Mr. Chait to be liable to the Vermont Commissioner does not automatically mean that [PwC] is similarly liable. Your job as jurors will be to determine whether you believe, on the basis of the evidence you have heard, that [PwC] was negligent in auditing the year-end 1981 financial statements of Ambassador Group, Inc., and whether their

28

negligence was a proximate cause of any damages which may have been incurred by Ambassador.

(App. 1493-94.)

Given the explicit jury charge, PwC's argument that it was prejudiced by the District Court's entry of default judgment against Chait's estate at the close of evidence is unpersuasive. Considering this portion of the District Court's charge, we believe it was possible for the jury to have determined that PwC had no liability and was not negligent in auditing the financials even in light of the Court's default judgment against the Estate. Furthermore, the jury verdict sheet questions were directed solely to PwC's conduct and only made reference to Chait in the context of determining his percentage of fault, if any.

PwC's reliance on In re Uranium Antitrust Litigation, 617 F.2d 1248 (7th Cir. 1980) is unavailing. Although the Seventh Circuit held that a damages hearing should not be held until the liability of each defendant had been resolved, it reasoned that holding one damages hearing for a defaulting defendant prior to the resolution of the liability of joint and severally liable non-defaulting defendants could result in inconsistency and possibly two distinct damages awards on a single claim. Id. at 1262. The Court found this to be a concern of "possible inconsistency and judicial economy, rather than actual prejudice." Id. Here, there was no attempt by the District Court to inquire into or have Chait's damages determined before PwC's liability was determined. Furthermore, the District Court in the instant case noted its "strong desire to try all of [the Commissioner's] claims together" for judicial economy. (App. 173.)

Similarly unavailing is PwC's reliance on Fehlhaber v. Indian Trails, Inc., 425 F.2d 715, 717 (3d Cir. 1970), which only held that it was within the discretionary authority of the court to hold a Rule 55(b)(2) hearing to determine the amount defendant was entitled to by reason of the third party defendants' default. There was no issue of joint and several liability in Fehlhaber nor did the court hold that such a hearing was required when there was a defaulting defendant.

29

Based on the record before us and the District Court's multiple rulings on PwC's motions for separate trials, we find that the District Court did not abuse its discretion by denying the motions for separate trials.

## VI. Damages

PwC argues that the $119 million damages award is excessive because it exceeds Ambassador's total insolvency and contradicts the Commissioner's theory that Ambassador was already insolvent at the end of 1981.

### A. Waiver

We first address the Commissioner's argument that PwC waived its argument about damages by failing to argue this point before the District Court. In PwC's motion for a new trial, PwC asserted that a new trial was required because the damages were excessive and irreconcilable with the jury's findings. PwC also contended that the damages award exceeded Ambassador's actual insolvency in its post trial motion for summary judgment. As PwC asserts, the Commissioner responded to these arguments before the District Court and the District Court acknowledged PwC's argument that the damages awarded were unreasonably excessive. Thus, based on the record created before the District Court, PwC did not waive its argument that the damages award was excessive, and the issue is properly before us.

### B. Damages Calculation

PwC argues that the damages award is excessive because it exceeds Ambassador's total insolvency. It further maintains that the award of $119 million contradicts the Commissioner's theory that Ambassador was already insolvent at the end of 1981 and that such inconsistency entitles PwC to a new trial on liability and damages. In other words, PwC contends that the unpaid liabilities allegedly caused by PwC's negligent audit cannot possibly exceed Ambassador's total unpaid liabilities. Thus, PwC argues that as the Commissioner's expert calculated the net loss from continuing operations after March 31, 1982 to be $107 million, based on

Ambassador's total insolvency as of December 31, 2004 (the latest calculation before trial) of $125.3 million less $18.3 million in litigation expenses, the $119.9 million in damages awarded by the jury is logically too high. Finally, PwC argues that any amount above $125.3 million, including interest, will go to the Estate, because it would exceed what Ambassador owes its creditors in liquidation, creating a windfall recovery to the Estate.

In response, the Commissioner explains that $125.3 million was calculated as an alternative theory of damages, which PwC attacked at trial. The $125.3 million was based on the amount of current assets that Ambassador owed to creditors as of that point in time that it could not pay with available assets. At trial, the Commissioner ultimately opted not to offer that calculation and instead submitted the $119.9 million "net loss from continuing operations after March 31, 1982" measure of damages. (App. 1886-87.) The Commissioner also responds that there will be no windfall to the Estate given that damages were calculated as of December 31, 2004.

We "review district court's ruling on a new trial motion for only abuse of discretion." Honeywell, Inc. v. Am. Standards Testing Bureau, 851 F.2d 652, 655 (3d Cir. 1988). A jury's damages award will not be upset so long as there exists sufficient evidence on the record, which if accepted by the jury, would sustain the award. See National Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 496 (3d. Cir 1987). In denying PwC's post-judgment motion for summary judgment, the District Court noted that PwC went to lengths to discredit the Commissioner's expert damages calculations of $125.3 million actual insolvency and perhaps for this reason the jury declined to accept this calculation. The District Court found that the Commissioner had presented sufficient evidence in support of its damages theory to permit the jury's finding. Reviewing the testimony of the Commissioner's damages expert, it is clear that if the jury accepted his calculation there was sufficient evidence to sustain an award of $119.9 million as detailed by his testimony. Moreover, as the District Court noted, "the jury specifically requested the item-by-item breakdown of [the Commissioner's] calculation of damages . . . [and l]ittle more than an hour after

31

receiving this information, the jury returned a verdict for the full amount of damages." (App. 254.)  Furthermore, having decided that Chait's conduct is not imputed to Ambassador, PwC's reliance on NCP, is unpersuasive as to the issue of determining damages and concerns that the Estate may reap a windfall.  Thus, we agree with the District Court that the jury accepted the Commissioner's damages calculations and the District Court did not abuse its discretion in denying PwC's motion for new trial.

## VII. Prejudgment Interest

We now turn to the District Court's calculation of prejudgment interest.  We review a district court's determination to require the payment of prejudgment interest for abuse of discretion.  Ambromovage v. United Mine Workers of America, 726 F.2d 972, 982 (3d Cir. 1984).  The district court may exercise this discretion upon "considerations of fairness" and prejudgment interest may be denied "when its exaction would be inequitable." Id. (quoting Bd. of Comm'rs of Jackson County v. United States, 308 U.S. 343, 352 (1939)).  Under New Jersey state law, the purpose of prejudgment interest is to "compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier."  Ruff v. Weintraub, 519 A.2d 1384, 1390 (N.J. 1987).

PwC contends that the $63 million prejudgment interest award by the District Court was punitive rather than merely compensatory and violates New Jersey's prohibitions against the recovery of prejudgment interest on future economic losses and awarding compound interest.  PwC maintains that the bulk of damages accrued after the Commissioner brought this action in 1985, yet the District Court's award calculates prejudgment interest as if each loss existed on the day the case was filed.  Accordingly, PwC argues that the Commissioner is only entitled to prejudgment interest on "past loss" measured from the specific date each of Ambassador's liabilities became payable.

In calculating the amount of prejudgment interest, the District Court accepted the Commissioner's proposal to strike $54.5 million from the verdict to remove all future economic

32

losses, easily resolving PwC's first argument that the award was punitive and violated New Jersey's prohibitions against the recovery of prejudgment interest on future economic losses. The Commissioner arrived at the number of the amount to strike from the verdict, $54.5 million, by adding $36.0 million for "net unpaid claims" and $20.9 million for "assumed claims payable to Horizon," both of which represent future economic losses, and reducing it to the present value. After reducing the verdict of $119.9 million by $54.5 million, the amount of future economic losses, the District Court used a base verdict of $65.4 million to calculate prejudgment interest.

The District Court found that while all the claims had not been filed when this action commenced, the losses were nevertheless actuarial and anticipated at the time the Complaint was filed. The District Court calculated prejudgment interest on the full amount of damages from 1985 to the date of its judgment, September 30, 2005. We conclude that the District Court did not abuse its discretion in doing so.

New Jersey Rules Governing Civil Practice states that:

Except where provided by statute with respect to a public entity or employee, and except as otherwise provided by law, the court shall, in tort actions, including products liability actions, include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. Prejudgment interest shall not, however, be allowed on any recovery for future economic losses.

N.J. Court R. 4:42-11(b). The claims incurred by the company after the filing of the action were not future losses, defined under New Jersey law as those that accrue after judgment, but rather damages that became actualized after the filing of the complaint. See McKeand v. Gerhard, 751 A.2d 158, 159 (N.J. Super. Ct. App. Div.

2000).  PwC does not contest that the claims were actuarial and anticipated at the time the action was filed.

The language of the Rule provides that interest should be calculated from the date of the institution of the action without reference to when during the litigation a particular claim was actualized.  It is well settled that the purposes for awarding prejudgment interest in tort actions are not only to compensate plaintiffs for not having use of judgment money while their actions are pending and to require defendants to give up benefits of their use of money during that time, but also to encourage defendants to settle cases.  See Ruff v. Weintraub, 519 A.2d 1384, 1390(N.J. 1987).  Based on these considerations, we find that the District Court appropriately calculated prejudgment interest on the damages for the entire period since the filing of the action.

We also conclude that the District Court did not violate the prohibition against compound interest.  At issue is a $26.8 million "hypothetical borrowing cost" embedded in the damages set forth by the Commissioner.  Of this $26.8 million, $14.2 million is hypothetical interest earned on the premiums for policies after March 31, 1982.  The difference between these amounts is a $12.6 million "net interest expense."  PwC argues that the entire $26.8 million "hypothetical borrowing cost" should be deducted from the verdict prior to calculating the prejudgment interest.

The District Court deducted the $12.6 million net interest expense from the base verdict of $65.4 million, noting that it was the only part of the $26.8 million item that appeared in the verdict. The District Court then calculated the prejudgment interest as $75.6 million and deducted an additional $12.6 million, arriving at the prejudgment award of $63 million. The District Court deducted the second $12.6 million because otherwise it would have resulted in an award of prejudgment interest higher than the Commissioner sought.  The Court recognized that this second deduction, "would treat the $12.6 million item as having never been found by the jury" but nonetheless deducted it so as to not let the  Commissioner recover twice.  (App. 262.)

The Commissioner's view is that PwC is complaining of a

ruling in its favor. The question before us is whether the Court abused its discretion in "netting" the two interest figures contained in the avoidable loss damage calculation. While the $26.8 million item represents a hypothetical borrowing cost, the District Court did not abuse its discretion by concluding that Ambassador would have earned $14.2 million in interest on the premiums and this required an offsetting of the hypothetical interest expense.

## VIII. Joint and Several Liability

Finally, we turn to PwC's argument that the District Court should have applied Vermont law on joint and several liability, under which PwC cannot be liable for more than its 40% proportionate share of the judgment, because Ambassador was domiciled in Vermont. The District Court's interpretation and application of New Jersey's choice of law rules is a purely legal matter and therefore subject to plenary review by this Court. Simon v. United States, 341 F.3d 193, 199 (3d Cir. 2003).

It is well established that in a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern each of the issues of a case. Klaxon Co. v. Stentor Elec. Mfg., 313 U.S. 487, 496 (1941). New Jersey has accepted the "governmental interest" choice of law test. Warriner v. Stanton, 475 F.3d 497, 500 (3d Cir. 2007) (citing Veazey v. Doremus, 510 A.2d 1187 (N.J. 1986)). Under this inquiry we must determine "the state with the greatest interest in governing the particular issue" and apply the laws of that state. Id. at 500 (quotations omitted). "The governmental interest analysis is fact-intensive: 'Each choice-of-law case presents its own unique combination of facts — the parties' residence, the place and type of occurrence and the specific set of governmental interest-that influence the resolution of the choice-of-law issue presented.'" Id. (quoting Erny v. Estate of Merola, 792 A.2d 1208, 1221 (N.J. 2002)). Furthermore, the New Jersey Supreme Court has held that choice-of-law determinations are made on an issue-by-issue basis, with each issue receiving separate analysis. See Erny, 792 A.2d at 1213 (citing Gantes v. Kason Corp., 679 A.2d 106, 108-09 (N.J. 1996)).

35

The first prong of the governmental interest test requires us to determine whether there is an actual conflict between the laws of the states involved. Erny, 171 A.2d at 1216. Unquestionably, an actual conflict exists between the respective joint and several liability laws of New Jersey and Vermont. At the time of PwC's negligence and in 1985, when the Commissioner filed his action, New Jersey law provided for joint and several liability for all joint tortfeasors. N.J. Stat. Ann. § 2A:15-5.3 (Supp. 1974). The New Jersey statute has since been amended twice, in 1987 and in 1995, to limit the applicability of joint and several liability. The current statute, as amended in 1995, only permits joint and several liability to defendants 60% or more at fault. N.J. Stat. Ann. § 2A:15-5.3(a) (West 2008). Meanwhile, Vermont established a system of comparative negligence and abolished joint and several liability among joint tortfeasors in 1970. Vt. Stat. Ann., tit. 12 § 1036 (1969).

The second prong of the governmental interest analysis requires us to determine the interest that each state has in applying its joint and several liability law to the parties in this litigation. Erny, 792 A.2d at 1216 (citing Fu v. Fu, 733 A.2d 1133, 1138 (N.J. 1999)). Five factors drawn from section 145 of the Restatement (Second) of Conflict of Laws guide courts in applying the governmental interest test in tort cases. Id. The factors are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Id. The New Jersey Supreme Court has held that "[t]he most important of those is the competing interests of the states." Erny, 792 A.2d at 1217. The initial focus "should be on 'what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether these concerns will be furthered by applying that law to the multi-state situation.'" Id. (quoting Fu, 733 A.2d at 1142 (citations omitted) (brackets in original)).

In its opinion entering judgment, the District Court held that PwC and Chait's estate were joint tortfeasors and were both jointly and severally liable for the entire amount of the $119.9 million jury verdict. The District Court did not undertake a separate choice of

36

law analysis to determine whether New Jersey or Vermont law should apply to the issue of whether PwC is jointly and severally liable with Chait's estate for the full amount of damages at the time it entered judgment. Instead, the District Court applied New Jersey law on joint and several liability solely based on its earlier opinion denying PwC's motion for summary judgment that New Jersey state law would govern the substantive issues in this case.[15]

After entering judgment, and in response to PwC's motion to amend the judgment pursuant to Rule 59(e), the District Court corrected its error of applying New Jersey law on joint and several liability simply because it applied that state's law to the substantive issues, and addressed the choice of law issue as it pertained to the question of joint and several liability. To determine Vermont's interest in having its comparative negligence statute applied, the District Court examined the policy underlying the Vermont statute and analyzed Vermont's contacts with PwC's conduct and the Commissioner's litigation. The District Court then analyzed New Jersey's interest by looking to the policy underlying the statute that was in place in 1985, the year that the Commissioner filed this action. The District Court held that New Jersey had the superior interest in having its law determine the allocation of damages because its policy favoring full compensation of tort victims would be frustrated by application of Vermont's comparative negligence statute, whose policy favored the equitable allocation of damages among Vermont tortfeasors. The Court also concluded that Vermont had no interest in ensuring that PwC and the Estate pay only their pro rata share of damages.

PwC contends that the District Court erred by looking at the policy underlying New Jersey's joint and several liability statute in

---

[15] In granting summary judgment, because the District Court determined that there was no conflict between New Jersey and New York law regarding an auditor's liability for negligence or malfeasance, it chose to apply New Jersey law. PwC does not appeal the application of New Jersey law for purpose of the substantive issues, but rather only contests the application of New Jersey law as to joint and several liability.

effect in 1985 rather than the statute currently in effect. It argues that because New Jersey's current statute would only hold PwC liable for its proportionate share of damages, New Jersey would have no interest in applying its superseded joint and several liability statute. In addition, PwC argues that Vermont has a greater interest in this case because of its stated position that it is a domicile of choice for insurance companies.

The Commissioner maintains, however, that even though New Jersey Legislature did not make the amendments limiting joint and several liability retroactive, PwC's assertion, if accepted, would have us do so. The Commissioner also argues that Vermont has no interest in having its law applied, as its only contact with this litigation is that Ambassador and the Commissioner are domiciled there.

To determine whether the District Court should have looked to the 1995 amendment for New Jersey's current policy on joint and several liability we examine the New Jersey Supreme Court's opinion in Erny, 792 A.2d 1208, for guidance. In Erny, the Supreme Court had to determine whether to apply the New York or New Jersey joint and several liability statute in a case arising from an automobile accident that took place in New Jersey. 792 A.2d at 1210. The accident involved a New Jersey plaintiff and occurred in 1992, so the applicable New Jersey joint and several liability statute was the 1987 version. Id. at 1219. In assessing New Jersey's governmental interest in having the 1987 version of the statute applied, the Court looked to the 1995 amendments to understand the legislature's desire to limit joint and several liability. Id. The Court stated that "[a]mendments to New Jersey's statute indicate, however, that the Legislature limited the liability of joint tortfeasors to address concerns about both the rising cost of insurance and increasing litigation." Id. at 1219. In making this statement, the Court noted that the interest and purpose of the 1987 and 1995 statutes were consistent. Id. The Court further declared that "the policy underlying New Jersey's joint and several liability law promotes redress to plaintiffs but declines to make a joint tortfeasor fully responsible for damages beyond his or her allocated share unless that tortfeasor is more than sixty percent at fault. New Jersey's policy thus reflects a balancing of interests that factors in

its concern about increased liability insurance costs." Id. at 1219-20.

Unlike Erny, where there were two versions of the statute both incorporating amendments limiting joint and several liability (1987 and 1995), we only consider the law as it was in 1985 and the current version of the statute. We do not read Erny to hold that a court may look past the governmental interest reflected in a law if the legislature has changed the law without making it retroactive. We conclude that the New Jersey Supreme Court's reading of the policy underlying the current statute merely explains New Jersey's desire to reduce insurance costs prospectively. Given that the amendments were not made retroactive, we are not inclined to find that the New Jersey legislature had an interest in reducing liability for torts that had already occurred, and had presumably been factored into the tortfeasor's liability insurance coverage. If courts only looked to the policy of the current statute, which is now inconsistent with the law that may be applied based on when the tortious conduct took place, application of the 1985 statute would be rendered null. We do not believe this was New Jersey legislature intended effect of the amendments.

Finally, as the Supreme Court stated in Erny, the Restatement (Second) of Conflict of Laws requires that we look at the contacts of the parties to a state in evaluating the governmental interest. Id. at 1217. We believe that the contacts of the parties in Erny are distinguishable from those here. In Erny, the two defendants were New York residents. Here, none of the present defendants are Vermont residents. Id. at 1212. Vermont has less of an interest in protecting a non-Vermont citizen from joint and several liability. More significantly, Ambassador's principal place of business was in New Jersey, the actionable tort was committed in New Jersey, Ambassador's injury occurred in New Jersey, Chait was a resident of New Jersey, PwC actively conducted business in New Jersey and the relationship between the parties was centered in New Jersey.

We find PwC's reliance on In re Phar-Mor, Inc. Securities Litigation, 893 F. Supp. 484 (W.D. Pa. 1995) to be unpersuasive. In Phar-Mor, a Pennsylvania court applied New Jersey's choice of

39

law rules and found them to favor the application of Pennsylvania law over New Jersey law.  Id. at 489.  The court looked at the policy of an amendment in New Jersey privity law limiting accountant liability to third parties under New Jersey law, even though it did not apply as the substantive law to the claims asserted. Id. at 488-89.  The court found that Pennsylvania had a greater interest because it was the state where the audit reports in question were prepared, signed and issued, and where the auditors were licensed.  Id.  Vermont has none of these interests in the instant case and the change in New Jersey's joint and several liability law is not a reason to apply Vermont law.

As the Erny court stated, the determination of what state law applies must be informed by the "the individualized assessment that controls in the governmental-interests test that we apply to each choice-of-law determination."  792 A.2d at 1221.  Following this mandate, we find that the totality of the facts requires application of New Jersey law joint and several liability and the District Court correctly did so.

## IX.  Conclusion

For the reasons stated, we will affirm the judgment of the District Court.